919 F.2d 158
 32 ERC 1185, 287 U.S.App.D.C. 49, 59
USLW 2344,
21 Envtl. L. Rep. 20,365
 CHEMICAL MANUFACTURERS ASSOCIATION, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, INC., Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent (Two Cases).
 Nos. 86-1433, 86-1434 and 89-1686.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 23, 1990.
Decided Nov. 16, 1990.
 
 Carole Stern, with whom Richard A. Flye, Washington, D.C., was on the brief, for petitioner, Union Carbide Chemicals and Plastics Co., Inc., in Nos. 86-1434 and 89-1686, and intervenor in No. 86-1433. Christian Volz, San Francisco, Cal., and Peter L. Gray, Washington, D.C., also entered appearances for petitioner.
 John T. Smith, II, David F. Zoll and Kenneth M. Kastner, Washington, D.C., entered appearances for petitioner, Chemical Mfrs. Ass'n, in No. 86-1433.
 W. Christian Schumann, Atty., U.S. Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., Steven E. Silverman, Acting Asst. Gen. Counsel and Lee R. Tyner, Atty., U.S. E.P.A., were on the brief, for respondent in Nos. 86-1433, 86-1434 and 89-1686. Dov Weitman, Atty., U.S. E.P.A., Bradley S. Bridgewater and Eileen T. McDonough, Attys., U.S. Dept. of Justice, also entered appearances for respondent.
 Before WALD, Chief Judge, MIKVA and RUTH B. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Chief Judge WALD.
 WALD, Chief Judge:
 
 
 1
 Petitioner Union Carbide Chemicals and Plastics Company, Inc. ("Union Carbide")[1] challenges certain aspects of two sets of regulations governing the time for closure of hazardous waste facilities promulgated by the Environmental Protection Agency ("EPA") pursuant to its authority under Sec. 3004(a) of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. Sec. 6924(a). Union Carbide asserts that the regulations are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act ("APA"). 5 U.S.C. Sec. 706(2)(A). More specifically, Union Carbide alleges that: (1) the EPA violated the express intent of Congress in promulgating the contested regulations; and (2) the EPA failed to justify adequately the regulatory choices it made, acted irrationally and inconsistently in adopting the regulations, and applied the wrong legal standard in assessing the need for the regulations. We conclude that the challenged regulations are consistent with congressional intent and that the EPA did not act arbitrarily or capriciously in promulgating them. Accordingly, we deny the petitions for review.
 
 I. BACKGROUND
 
 2
 Subtitle C of the RCRA, 42 U.S.C. Secs. 6921-39b, creates a comprehensive framework for the treatment and disposal of hazardous wastes. Under Sec. 3004(a) of the RCRA, 42 U.S.C. Sec. 6924(a), the EPA is required to "promulgate regulations establishing such performance standards [for hazardous waste facilities] as may be necessary to protect human health and the environment." Under Sec. 3005(a) of the RCRA, 42 U.S.C. Sec. 6925(a), compliance with the performance standards promulgated by the EPA is required for issuance of a permit authorizing the construction or operation of a hazardous waste facility. Facilities already in operation as of November 19, 1980, known as "interim status" facilities, are required to meet all applicable performance standards promulgated under Sec. 3004(a) and to apply for permits if they wish to remain in operation, but they are to be treated as having been issued a permit until final administrative action has been taken on their permit applications. RCRA Sec. 3005(e), 42 U.S.C. Sec. 6925(e).
 
 
 3
 In May 1980, the EPA promulgated final regulations under the authority of Sec. 3004(a) pertaining to the closure of interim status hazardous waste facilities. See 45 Fed.Reg. 33,242-43 (May 19, 1980). In January 1981, the EPA issued final closure regulations for "permitted" facilities (i.e., those facilities actually issued permits under the RCRA); these regulations also revised the regulations governing interim status facilities. See 46 Fed.Reg. 2849-51, 2875-77 (Jan. 12, 1981) (the "1981 closure regulations"). The regulations required both permitted and interim status facilities to treat, remove, or dispose of all hazardous wastes within 90 days after receiving the final volume of "hazardous wastes." 40 C.F.R. Secs. 264.113(a), 265.113(a) (1981).[2] Companion provisions required facilities to complete closure within 180 days after receiving the final volume of "wastes." 40 C.F.R. Secs. 264.113(b), 265.113(b) (1981).[3] These provisions remained essentially unchanged until 1986.
 
 
 4
 Congress extensively modified the RCRA in the Hazardous and Solid Waste Amendments of 1984 (the "1984 Amendments" or "Amendments"). A major purpose of the 1984 Amendments was to discourage the use of land facilities for the storage and disposal of hazardous wastes. See RCRA Sec. 1002(b)(7), 42 U.S.C. Sec. 6901(b)(7). Among the specific provisions added by the Amendments was one requiring new surface impoundments and landfills used for the management of hazardous wastes to meet certain minimum technological requirements, including the use of double liners and leak detection systems. RCRA Sec. 3004(o ), 42 U.S.C. Sec. 6924(o ). A related provision requires that, with certain exceptions not relevant here, surface impoundment facilities that were classified as interim status on November 8, 1984, must not "receive, store, or treat hazardous waste" after November 8, 1988, unless they are retrofitted to meet the minimum technological requirements applicable to permitted facilities. RCRA Sec. 3005(j), 42 U.S.C. Sec. 6925(j).
 
 
 5
 In March 1985, the EPA proposed revising Secs. 264.113(b) and 265.113(b) to mandate closure within 180 days after the final receipt of "hazardous wastes," rather than within 180 days after the final receipt of "wastes," as provided in the original regulations. The Chemical Manufacturers Association ("CMA") and Union Carbide argued in comments to the EPA on the proposed regulations that it was environmentally unnecessary to require closure of facilities that cease receiving hazardous wastes and intend to receive only non-hazardous wastes thereafter. They also argued that the proposed regulations were inconsistent with the 1984 Amendments because the legislative history of those amendments showed that Congress intended to authorize the receipt of non-hazardous wastes by unretrofitted surface impoundments that have ceased to receive hazardous wastes. See Comments of Union Carbide Corporation (May 14, 1985), reprinted in Joint Appendix ("J.A.") at 33-39; Comments of the Chemical Manufacturers Association (May 20, 1985), J.A. 40-62.
 
 
 6
 The EPA promulgated a final set of regulations in May 1986 (the "1986 closure regulations") that included the contested revisions and made certain other minor changes to the prior regulations. See 51 Fed.Reg. 16,445, 16,452-53 (May 2, 1986).[4] In response to the comments from Union Carbide and CMA, the EPA asserted that the closure provisions were environmentally necessary and rejected the argument that the revisions were inconsistent with Congress' intent in enacting the 1984 Amendments. Id. at 16,432. In addition, the EPA argued that the revisions merely clarified an ambiguity in the regulations as originally promulgated, which it claimed were in fact intended to require hazardous waste facilities to close within 180 days of their final receipt of hazardous waste. Id. at 16,431. Union Carbide, by contrast, asserts that the absence of the word "hazardous" from paragraph (b) of each relevant provision prior to the 1986 revisions allowed those facilities that stopped receiving hazardous wastes to continue receiving non-hazardous wastes, so long as they complied with the requirements of paragraph (a).
 
 
 7
 In July 1986, Union Carbide and CMA filed two of the petitions for review consolidated in this proceeding. The parties began settlement negotiations shortly thereafter, leading this court to stay proceedings pending the results of the negotiations. In June 1988, the EPA proposed a set of amendments to the 1986 closure regulations that attempted to address petitioners' concerns. After considering comments from petitioners and others on the proposed amendments, the EPA revised them in certain particulars and, in August 1989, promulgated them in final form (the "1989 closure regulations"). As amended, Secs. 264.113 and 265.113 now provide that both permitted and interim status surface impoundments may continue operations after ceasing to receive hazardous wastes so long as they either meet the minimum technological requirements imposed by the 1984 Amendments, or remove all significant amounts of accumulated hazardous wastes.[5]
 
 
 8
 In November 1989, Union Carbide, unsatisfied with the EPA's action, filed a petition for review of the 1989 closure regulations. That petition was subsequently consolidated with the two filed previously, and all three petitions are now before this court.
 
 II. ANALYSIS
 
 9
 A. Did the EPA Exceed Its Statutory Authority?
 
 
 10
 Union Carbide's first challenge to the 1986 and 1989 closure regulations is that they contradict Congress' express intent in enacting the 1984 Amendments. The EPA responds that the 1984 Amendments left untouched its pre-existing authority under Sec. 3004(a) of the RCRA to promulgate regulations establishing standards for hazardous waste facilities that it finds necessary to protect human health and the environment. The EPA therefore concludes that it had ample statutory authority to issue both sets of regulations.[6]
 
 
 11
 In evaluating the parties' arguments, we must follow the rules laid down in Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, we inquire "whether Congress has directly spoken to the precise question at issue." Id. at 842, 104 S.Ct. at 2781. In determining whether Congress has so spoken, we must look to "the particular statutory language at issue, as well as the language and design of the statute as a whole," K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988), and we must employ the traditional tools of statutory construction, including, where appropriate, legislative history. Ohio v. United States Dept. of the Interior, 880 F.2d 432, 441 (D.C.Cir.1989). If the intent of Congress is clear, we must give it effect. Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. If, however, the statute is silent or ambiguous on a particular issue, we must defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purpose. Id. at 844-45, 104 S.Ct. at 2782-83.
 
 
 12
 The relevant statutory provision in the 1984 Amendments requires interim status surface impoundments to cease receiving, storing, or treating hazardous waste after November 8, 1988, unless they are retrofitted to meet the minimum technological requirements imposed on permitted facilities. RCRA Sec. 3005(j), 42 U.S.C. Sec. 6925(j). On its face, this provision certainly does not support Union Carbide's claim that Congress intended to deprive the EPA of authority to require unretrofitted surface impoundments to close once they cease receiving hazardous wastes.[7] There was, however, a brief but controversial exchange between two key senators upon which Union Carbide relies heavily for its argument that the 1984 Amendments do not allow the EPA to prevent such facilities from continuing to receive non-hazardous wastes. Senator Randolph, the ranking minority member of the Senate Committee on Environment and Public Works at the time and a sponsor of the Senate floor amendment that became, with some modifications, Sec. 3005(j), engaged Senator Chafee, the floor manager for the 1984 Amendments, in a colloquy concerning the potential effect of Sec. 3005(j) on existing surface impoundments that do not retrofit to meet the minimum technological requirements for hazardous waste facilities, but wish to continue receiving non-hazardous wastes. See 130 Cong.Rec. 20,847-48 (1984). (This exchange was not actually spoken on the floor of the Senate, as indicated by the bullets surrounding the remarks, but was instead inserted into the Congressional Record.) The colloquy began as follows:
 
 
 13
 Mr. RANDOLPH.... I would like to ask for additional clarification of one point. As I understand one provision in the committee's amendment, a surface impoundment which does not qualify to continue to receive or store hazardous waste after 4 years after enactment may, however, receive nonhazardous waste after that date for storage or disposal. Is that correct?
 
 
 14
 Mr. CHAFEE. Yes, the amendment provides for this.
 
 
 15
 Senator Randolph then described a critical surface impoundment facility located in his native state, West Virginia, that apparently could not be retrofitted and thus would be forced to close down altogether if it were barred from continuing to receive non-hazardous wastes.[8] The colloquy then continued:
 
 
 16
 Mr. RANDOLPH.... As I understand the committee amendment, if hazardous wastes were no longer received at the impoundment after the 4 year date in the amendment, the impoundment could otherwise continue to operate as it has. Does the Senate [sic] agree that this is within the intent of the committee amendment?
 
 
 17
 Mr. CHAFEE. Yes, Senator, I do. It would not be proper to require that impoundment to be closed out permanently prematurely if it can handle wastes that are not hazardous waste while being protective of human health and the environment.
 
 
 18
 According to Union Carbide, this exchange expresses a clear congressional intent to prevent the EPA from generically requiring the closure of unretrofitted surface impoundments that cease to receive hazardous wastes but have capacity to continue receiving non-hazardous wastes.[9] As further evidence thereof, Union Carbide cites the fact that the Senate version of the bill, which was the basis for the Randolph-Chafee colloquy, was ultimately adopted over the House version, which it claims would have required all surface impoundments containing hazardous wastes to either retrofit or close. The EPA responds that at most the colloquy expresses Congress' desire not to statutorily require closure of unretrofitted facilities and that the 1984 Amendments imposed no restraint on the EPA's pre-existing authority under Sec. 3004(a) of the RCRA to issue regulations governing the operation of hazardous waste facilities in the interests of protecting "human health and the environment." In support, EPA points to the bottom line of the colloquy__Senator Chafee's comment that closure of an unretrofitted impoundment would not be proper if it could handle non-hazardous wastes "while being protective of human health and the environment." The EPA concludes that the 1986 and 1989 closure regulations were based on just such an assessment.
 
 
 19
 We believe that Congress' intent on this issue was not entirely clear, but conclude under the second prong of Chevron that the EPA's interpretation is a reasonable one and is consistent with the purposes of the RCRA and the 1984 Amendments.[10] Although there is no explicit mention in the exchange of the EPA's residual authority under Sec. 3004(a) to regulate to protect human health and the environment, Senator Chafee's closing reservation echoes its theme and strongly suggests that the Senator intended to defer to an authoritative agency assessment of harm to human health and the environment.[11] Moreover, contrary to Union Carbide's assertion, the House bill's provisions on surface impoundments were not substantially different from the Senate bill's provisions. The House would have required that "no hazardous waste ... may be placed or maintained in a surface impoundment" unless it complied with the new technological standards within four years. 129 Cong.Rec. 27,663 (1983) (emphasis added). The Senate version, by comparison, provided that existing surface impoundments "shall not receive, store, or treat hazardous waste" unless they comply with the new standards within four years. 130 Cong.Rec. 20,838 (1984) (emphasis added).[12] Although the Conference Committee adopted the Senate's phrasing, there is no indication that the legislators viewed the two versions as being substantially different.[13] In light of the statutory definition of "storage,"[14] we attach little significance to the conferees' choice of the words "receive, store, or treat" over the phrase "placed or maintained." The ultimate choice of language may well have reflected nothing more than a preference for the more familiar terms "store" and "treat" in the RCRA context over the theretofore unused terms in the House bill.[15] In any event, we cannot conclude that Congress, by adopting the Senate's language in Sec. 3005(j), expressly foreclosed the EPA from imposing a retrofit-or-close policy pursuant to its authority elsewhere in the RCRA.[16]
 
 
 20
 The explicit statutory policy of the 1984 Amendments discouraging the use of land facilities for the storage and disposal of hazardous wastes further supports the EPA's position that Congress did not intend to impair the EPA's pre-existing authority under Sec. 3004(a) to promulgate regulations necessary for the protection of human health and the environment. The 1984 Amendments state that "land disposal [of hazardous wastes], particularly landfill and surface impoundment, should be the least favored method for managing hazardous wastes." RCRA Sec. 1002(b)(7), 42 U.S.C. Sec. 6901(b)(7) (emphasis added). In furtherance of this statutory policy, Secs. 3004(o ) and 3005(j) of the Amendments imposed stringent new technological requirements on permitted and interim status surface impoundments. To conclude, then, that Congress intended to subject unretrofitted surface impoundments to less stringent standards than other types of land-based hazardous waste facilities, which continue to be subject to the EPA regulations requiring them to close within 180 days of receiving the final volume of hazardous wastes, would be anomalous at best. See 40 C.F.R. Secs. 264.113(b) and 265.113(b).[17]
 
 
 21
 For all these reasons we defer to the EPA's interpretation of its authority under Sec. 3004(a) as permitting it to continue to regulate the receipt by unretrofitted surface impoundments of non-hazardous wastes "to protect human health and the environment" even after the 1984 Amendments as a "permissible construction" of the statute. See Chevron, 467 U.S. at 843, 104 S.Ct. at 2781.
 
 
 22
 B. Are the Regulations Arbitrary and Capricious?
 
 
 23
 Union Carbide also attacks the 1986 and 1989 closure regulations as arbitrary and capricious. We reject these challenges as well. Initially, we note that Union Carbide challenges these regulations only as they apply to unretrofitted surface impoundments; moreover, some of Union Carbide's arguments apply only to the 1986 closure regulations and not to the 1989 revised closure regulations.[18]
 
 
 24
 1. Did EPA Fail to Consider the Useful Capacity of Unretrofitted Surface Impoundments for Continued Disposal of Non-hazardous Wastes?
 
 
 25
 Union Carbide charges that the EPA failed to consider the continued usefulness of unretrofitted surface impoundments that cease to receive hazardous wastes but retain capacity to receive non-hazardous wastes. Curiously, this argument ignores the fact that the principal if not the entire purpose of the EPA's 1989 revision of the closure regulations was to accommodate CMA's and Union Carbide's objections to the stark retrofit-or-close rule embodied in the 1986 regulations. Under the 1989 closure regulations, unretrofitted surface impoundments may remain open to receive non-hazardous wastes so long as they are emptied of accumulated hazardous wastes. The preamble to the 1989 regulations as initially proposed in 1988 clearly indicates that the EPA undertook the process of revision because it now agreed that there were "a number of sound policy reasons why it is desirable to allow units to delay closure to continue to receive non-hazardous waste, provided that it does not jeopardize protection of human health and the environment." 53 Fed.Reg. 20,739 (June 6, 1988). Among these policy reasons were avoiding disincentives to waste minimization in certain situations, preventing unnecessary disruption of operations at facilities with remaining capacity, and avoiding the imposition of unnecessary economic burdens on facility operators. Id. Similar statements can be found in the EPA's responses to comments by those objecting to the proposed revisions and in the preamble to the final rule. See EPA's Response to Comments to June 6, 1988 Proposed Rule at 62-63, J.A. 312-13; 54 Fed.Reg. 33,382 (Aug. 14, 1989). There is, then, simply no support in the record for Union Carbide's assertion that the EPA adopted the 1989 closure regulations without taking account of remaining capacity or utility of facilities for receiving non-hazardous wastes.
 
 
 26
 2. Did EPA Fail to Justify Adequately the Requirement that Unretrofitted Surface Impoundments Be Emptied of Hazardous Wastes in Order to Remain Open?
 
 
 27
 Union Carbide's next line of attack against the closure regulations is that the EPA failed to justify adequately the requirement in the 1989 regulations that unretrofitted surface impoundments be emptied of hazardous wastes if they wish to remain open to receive non-hazardous wastes. More specifically, Union Carbide asserts that the record (1) reveals no analysis of the actual likelihood of leaks from facilities that are not emptied of hazardous wastes, and (2) contains no indication that the EPA considered alternatives such as groundwater monitoring, corrective action, and financial assurance requirements that could provide adequate protection of human health and the environment. As a result, it charges that the EPA has failed to meet the requirement of reasoned decisionmaking imposed by the APA and judicial precedent. See, e.g., International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 815-18 (D.C.Cir.1983).
 
 
 28
 The record, however, paints a different picture. As to the specific alternatives Union Carbide mentions, the EPA discussed and rejected each one as inadequate to protect human health and the environment. See 54 Fed.Reg. 33,382-83 (Aug. 14, 1989); EPA's Response to Comments to June 6, 1988 Proposed Rule at 7-10, J.A. 257-60. The reason given by the EPA for rejecting these alternatives also refutes Union Carbide's allegation that the EPA failed to analyze the likelihood of leaks from unretrofitted surface impoundments that continue to store hazardous wastes. At several points in the record, the EPA explained that the accumulation of additional quantities of non-hazardous wastes on top of hazardous wastes significantly increases the risk of leaks because wastes in surface impoundments typically take the form of liquids or partial solids surrounded by liquids. Leachate is most likely to emanate from liquid or semiliquid wastes, and the continued accumulation of liquids in a surface impoundment tends to form a "pressure head" that forces downward dispersion of the leachate at the bottom. If an impoundment is unlined or inadequately lined, containment in such situations often is not possible. See Closure/Post-closure and Financial Responsibility Requirements (EPA 1986 Background Information Document) at 91-93, J.A. 111-13; 51 Fed.Reg. 16,432 (May 2, 1986); 54 Fed.Reg. 33,382 (Aug. 14, 1989). Thus, the EPA concluded in 1989, surface impoundments must either meet the minimum technological requirements of RCRA Sec. 3004(o ), which are designed to reduce significantly the risk of leaks, or remove accumulated hazardous wastes before continuing to receive non-hazardous wastes.[19] See 54 Fed.Reg. 33,382 (Aug. 14, 1989). The EPA's analysis of the "pressure head" syndrome was obviously based on research described in greater detail in an earlier set of hazardous waste regulations under the RCRA. See 48 Fed.Reg. 14,486 (April 4, 1983).[20]
 
 
 29
 It is not the role of courts to "second-guess the scientific judgments of the EPA," State of New York v. EPA, 852 F.2d 574, 580 (D.C.Cir.1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989), and we give considerable latitude to the EPA in drawing conclusions from scientific and technological research, even where it is "imperfect" or "preliminary." Ethyl Corp. v. EPA, 541 F.2d 1, 28 (D.C.Cir.1976), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Union Carbide neither refers to the research conducted by the EPA nor provides any reason why this court should not credit the EPA's scientific conclusions based thereon. Further, the EPA's conclusions are consistent with Congress' own finding that surface impoundments "are not capable of assuring long-term containment of certain hazardous wastes," RCRA Sec. 1002(b)(7), 42 U.S.C. Sec. 6901(b)(7), and the EPA's action here fully accords with Congress' determination that preventive measures should be preferred over corrective action in the area of hazardous waste management. One of the RCRA's explicit objectives is "requiring that hazardous waste be properly managed in the first instance[,] thereby reducing the need for corrective action at a future date," RCRA Sec. 1003(a)(5), 42 U.S.C. Sec. 6902(a)(5), for "if hazardous waste management is improperly performed in the first instance, corrective action is likely to be expensive, complex, and time consuming...." RCRA Sec. 1002(b)(6), 42 U.S.C. Sec. 6901(b)(6).
 
 
 30
 In light of all this, we believe the EPA has demonstrated that it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)).
 
 
 31
 3. Is the Requirement that Unretrofitted Surface Impoundments Close or Be Emptied Irrational and Inconsistent with Other EPA Regulations?
 
 
 32
 Union Carbide also asserts that the EPA's justifications for the closure regulations, even if taken at face value, cut too wide a swath because they apply equally to all surface impoundments, including those that are built or retrofitted to meet the minimum technological requirements imposed in 1984 and that are not required to close or be emptied of hazardous wastes. Union Carbide places special emphasis on the EPA's statement in the preamble to the final 1986 closure regulations (not repeated in the 1989 regulations) that "all liners will eventually leak" and that closure and capping thus is "critical for the long term control of the unit." 51 Fed.Reg. 16,432 (May 2, 1986). Be that as it may, the EPA's principal justification for regulating the continued delivery of non-hazardous wastes to unretrofitted surface impoundments has always stressed the special incremental risk of leaks from such units. See id.; 54 Fed.Reg. 33,382 (Aug. 14, 1989). It comes down to a judgment that all land disposal of hazardous wastes is risky, but some forms are riskier than others. We think the EPA has authority under the RCRA to differentiate between degrees of risk in regulating hazardous waste facilities.
 
 
 33
 The special danger posed by hazardous waste surface impoundments, combined with the RCRA's obvious preference for prevention over correction, also helps to explain the seemingly anomalous result that surface impoundments that comply with the minimum technological requirements are allowed to continue operating even when they leak, while unretrofitted impoundments are required to either close or be emptied of accumulated hazardous wastes even when they do not leak. The different results are dictated by the different levels of ex ante risks involved in the two situations. It was thus not irrational for the EPA to conclude that the goal of prevention is best served in the first situation by mandating that all surface impoundments intending to continue receiving hazardous wastes meet stringent technological requirements, with correction of any leaks that occur despite the precautions as a secondary safety valve, while prevention is best served in the second situation by requiring either closure or emptying of unretrofitted facilities even when they are not presently leaking.
 
 
 34
 Finally, Union Carbide claims that the EPA acted irrationally in failing to require the closure or emptying of landfills that do not meet the RCRA's minimum technological requirements while imposing such a requirement on surface impoundments. Again, however, the pressure head scenario provides the explanation. Liquids, whether or not they contain or are classified as hazardous wastes, generally are banned from placement or disposal in landfills, see RCRA Sec. 3004(c), 42 U.S.C. Sec. 6924(c), and landfills are therefore significantly less likely than surface impoundments to form pressure heads and to suffer the leachate problems associated with pressure heads. See EPA's Response to Comments to June 6, 1988 Proposed Rule at 14, J.A. 264. Further, Congress itself recognized that more stringent regulation of surface impoundments was needed when it decided, in enacting the 1984 Amendments, to require existing surface impoundments, but not existing landfills, either to meet the technological requirements of Sec. 3004(o ) or to stop receiving hazardous wastes. See RCRA Sec. 3005(j), 42 U.S.C. Sec. 6925(j); 54 Fed.Reg. 33,383 (Aug. 14, 1989).
 
 
 35
 We therefore conclude that the EPA acted rationally in imposing more stringent closure requirements on unretrofitted surface impoundments than on landfills or on surface impoundments that meet the minimum technological requirements mandated by the 1984 Amendments.
 
 
 36
 4. Did EPA Use the Wrong Legal Standard in Promulgating the 1989 Regulations?
 
 
 37
 Union Carbide next asserts that the EPA relied on a standard of "significantly improve[d] protection" of human health and the environment in promulgating the closure regulations rather than on the statutorily-mandated standard of "necessary to protect" human health and the environment. See RCRA Sec. 3004(a), 42 U.S.C. Sec. 6924(a). The EPA agrees that the latter standard is the one it is required to apply under the RCRA, but rejects the contention that it failed to apply it.
 
 
 38
 The only language cited by Union Carbide in support of its charge is contained in the preamble to the 1986 closure regulations, where the EPA stated that "the expeditious closure of hazardous waste disposal surface impoundments after they are no longer receiving hazardous waste for disposal would significantly improve protection of human health and the environment." 51 Fed.Reg. 16,432 (May 2, 1986). By contrast, the final 1989 closure regulations, as well as the proposed version of the regulations and EPA's responses to commenters, contain nothing to indicate that the EPA applied any standard other than the one mandated by Sec. 3004(a), the language of which, in fact, is quoted or paraphrased in a number of places in the preamble to the regulations. See, e.g., 54 Fed.Reg. 33,376, 33,379, 33,382 (Aug. 14, 1989). Even if the EPA's statement in 1986 is taken into account, Union Carbide's argument that it reflects the EPA's dependence on an improper legal standard must be rejected. Although the EPA did state that the closure regulations would "significantly improve" protection of human health and the environment, it immediately preceded this remark with one stating unequivocally that it was promulgating the regulations pursuant to its authority to promulgate regulations "as necessary to protect human health and the environment." 51 Fed.Reg. 16,432 (May 2, 1986). More importantly, the explanations provided by the EPA in the immediately succeeding paragraphs indicate that it believed the closure regulations were the only means of ensuring that human health and the environment would be protected adequately, given the leakage risks associated with facilities that are equipped neither with the technology required by Sec. 3004(o ) nor with the final "cap" required to be installed at the end of the facility's life. Id. Although it is true that the EPA changed its tune in 1989 to the extent of permitting unretrofitted surface impoundments to remain open so long as they removed accumulated hazardous wastes, this does not indicate that it was applying the wrong legal standard in 1986.
 
 
 39
 5. Did the 1989 Regulations Constitute a Reversal of Policy Without Adequate Support in the Record?
 
 
 40
 Union Carbide argues finally that the 1986 and 1989 closure regulations constituted a reversal of the EPA's prior policy, which, as noted earlier, Union Carbide interpreted as allowing for the continued receipt of non-hazardous wastes after the final receipt of hazardous wastes at a facility. Union Carbide claims that nothing in the rulemaking record provides any justification for this reversal of policy. See State Farm, supra, 463 U.S. at 41-42, 103 S.Ct. at 2865-66. The EPA claims that the changes did not constitute a reversal of policy but merely clarified an ambiguity in the original regulations. In addition, the EPA argues that even if it did reverse its prior policy, the record amply justifies the new regulatory path.
 
 
 41
 Neither party has provided specific evidence that, between promulgation of the 1981 and 1986 versions of the closure regulations, the EPA acted affirmatively in a way that supports or undermines its present interpretation of the original regulations. Such inaction undercuts Union Carbide's policy reversal argument to the extent it indicates that the EPA had no "settled course of behavior." See id. at 41, 103 S.Ct. at 2866. Additionally, Union Carbide must buck the doctrine that "[a]n agency's interpretation of its own regulations will be accepted unless it is plainly wrong." General Carbon Co. v. Occupational Safety and Health Review Comm'n, 860 F.2d 479, 483 (D.C.Cir.1988). Although the language of the 1981 closure regulations seems more naturally to support Union Carbide's interpretation than the EPA's, we cannot say that the EPA's position, that the word "wastes" in Secs. 264.113(b) and 265.113(b) as originally promulgated was meant to refer back to the words "hazardous wastes" in Secs. 264.113(a) and 265.113(a), is "plainly wrong." It should also be noted that the EPA is not proposing its interpretation of the 1981 closure regulations for the first time in this court, but advanced it at the time it promulgated the 1986 closure regulations. See 51 Fed.Reg. 16,43 1 (May 2, 1986).
 
 
 42
 Union Carbide points to a statement in a June 26, 1990 Federal Register notice as indicating that the EPA has in fact acknowledged that the 1986 revisions represented a reversal of policy. This notice characterized the 1986 closure regulations as "more stringent" than the 1981 regulations. 55 Fed.Reg. 25,977 (June 26, 1990). But the same notice also reiterated the EPA's position that the 1986 regulations were meant to "clarify" the existing closure regulations and to conform Secs. 264.113(b) and 265.113(b) with the requirements of Secs. 264.113(a) and 265.113(a). Id. The "more stringent" language apparently was included for technical reasons: a change that is classified as "more stringent" is mandatory on states with hazardous waste management programs approved under RCRA Sec. 3006, 42 U.S.C. Sec. 6926, and prevents the possibility that those states might apply the laxer standard suggested by Union Carbide's reading of the 1981 regulations. In light of the deference owed to the EPA's interpretation of its regulations, we believe this explanation suffices.
 
 
 43
 In sum, the 1986 and 1989 closure regulations seem more accurately classified as "extension[s] of current regulation[s]" than as "rescission[s] of prior action." See State Farm, supra, 463 U.S. at 42, 103 S.Ct. at 2866. But even if the higher standard of scrutiny applicable to reversals is applied, we believe the EPA's justifications for the 1989 regulations are sufficient and are supported by Congress' adoption of the 1984 Amendments, which, as we have seen, significantly strengthened the EPA's regulatory powers under the RCRA in general and, more particularly, announced a strong policy against reliance on land disposal of hazardous wastes.
 
 III. CONCLUSION
 
 44
 The EPA's interpretation of Sec. 3004(a) of the RCRA as permitting it, subsequent to the 1984 Amendments, to prohibit the continued receipt of non-hazardous wastes by unretrofitted surface impoundments that are not emptied of accumulated hazardous wastes is a permissible one. In addition, the EPA has adequately justified its decision to impose such a ban generally. The petitions for review are accordingly
 
 
 45
 Denied.
 
 
 
 [1]
 The Chemical Manufacturers Association, the other petitioner in these consolidated cases, did not participate in oral argument before this court, nor did it file a brief or join in the briefs filed on behalf of Union Carbide. It thus appears that, although it has not withdrawn its petition for review, the Chemical Manufacturers Association is not pressing its claims before this court
 
 
 [2]
 Sections 264.113(a) and 265.113(a) provided in relevant part:
 (a) Within 90 days after receiving the final volume of hazardous wastes, [or 90 days after approval of the closure plan, if that is later,] the owner or operator must treat, remove from the site, or dispose of on-site, all hazardous wastes in accordance with the approved closure plan.
 The bracketed language appeared in Sec. 265.113(a) but not in Sec. 264.113(a).
 
 
 [3]
 Sections 264.113(b) and 265.113(b) provided in relevant part:
 (b) The owner or operator must complete closure activities in accordance with the approved closure plan and within 180 days after receiving the final volume of wastes [or 180 days after approval of the closure plan, if that is later].
 The bracketed language appeared in Sec. 265.113(b) but not in Sec. 264.113(b).
 
 
 [4]
 As revised in 1986, Secs. 264.113 and 265.113 provided in relevant part as follows:
 (a) Within 90 days after receiving the final volume of hazardous wastes at a hazardous waste management unit or facility, [or within 90 days after approval of the closure plan, whichever is later,] the owner or operator must treat, remove from the unit or facility, or dispose of on-site, all hazardous wastes in accordance with the approved closure plan....
 (b) The owner or operator must complete partial and final closure activities in accordance with the approved closure plan and within 180 days after receiving the final volume of hazardous wastes at the hazardous waste management unit or facility[, or 180 days after approval of the closure plan, if that is later]....
 The bracketed language appeared in Sec. 265.113 but not in Sec. 264.113.
 
 
 [5]
 As revised in 1989, Secs. 264.113 and 265.113 now read in relevant part as follows:
 (a) Within 90 days after receiving the final volume of hazardous wastes, or the final volume of non-hazardous wastes if the owner or operator complies with all applicable requirements in paragraphs (d) and (e) of this section, at a hazardous waste management unit or facility, [or within 90 days after approval of the closure plan, whichever is later,] the owner or operator must treat, remove from the unit or facility, or dispose of on-site, all hazardous wastes in accordance with the approved closure plan....
 (b) The owner or operator must complete partial and final closure activities in accordance with the approved closure plan and within 180 days after receiving the final volume of hazardous wastes, or the final volume of non-hazardous wastes if the owner or operator complies with all applicable requirements in paragraphs (d) and (e) of this section, at the hazardous waste management unit or facility[, or 180 days after approval of the closure plan, if that is later]....
 (e) ... [A]n owner or operator of a hazardous waste surface impoundment that is not in compliance with the liner and leachate collection system requirements in 42 U.S.C. Secs. 3004(o )(1) and 3005(j)(1) or 42 U.S.C. Sec. 3004(o )(2) or (3) or Sec. 3005(j)(2), (3), (4) or (13) must:
 (2) Remove all hazardous wastes from the unit by removing all hazardous liquids and removing all hazardous sludges to the extent practicable without impairing the integrity of the liner(s), if any.
 (3) Removal of hazardous wastes must be completed no later than 90 days after the final receipt of hazardous wastes....
 The bracketed language appears in Sec. 265.113 but not in Sec. 264.113.
 
 
 [6]
 Contrary to Union Carbide's assertion, see Petitioner's Brief at 31-32, the EPA did explicitly address in both the 1986 and 1989 regulations the 1984 Amendments' effect on its pre-existing authority under Sec. 3004(a). In fact, it did so in direct response to Union Carbide's arguments. See 51 Fed.Reg. 16,432 (May 2, 1986); 54 Fed.Reg. 33,382 (Aug. 14, 1989)
 
 
 [7]
 In fact, Sec. 3005(j) is most naturally read to require the "close or empty" policy adopted by the EPA in the 1989 regulations insofar as it states that unretrofitted surface impoundments "shall not receive, store, or treat" hazardous wastes after November 8, 1988 (emphasis added). The EPA, however, explicitly eschewed reliance on this phrase as a basis for its closure policy, concluding that the legislative history signified only an intent to bar receipt of hazardous wastes for storage after that date. See 54 Fed.Reg. 33,382 (Aug. 14, 1989)
 
 
 [8]
 This facility is the Holz Pond impoundment owned by Union Carbide, located in South Charleston, West Virginia. From the record, this appears to be the only facility facing severe adverse economic consequences as a result of the 1989 closure regulations
 
 
 [9]
 In its Reply Brief, Union Carbide stated that it was "not arguing that Holz Pond or any other facility should be allowed to stay open for the continued receipt of non-hazardous waste even if such use would not be protective of human health and the environment." Petitioner's Reply Brief at 10-11. At oral argument, counsel for Union Carbide elaborated on this position by claiming that the EPA erred in making its regulations applicable to all surface impoundments rather than requiring a case-by-case assessment as to whether the future receipt of non-hazardous wastes in a facility that formerly received hazardous wastes would be injurious to human health or the environment
 
 
 [10]
 Even if we agreed with Union Carbide's interpretation of the colloquy, we would be reluctant to give controlling weight to an isolated exchange of this type. See, e.g., United Mine Workers v. Federal Mine Safety & Health Review Comm'n, 671 F.2d 615, 620-23 (D.C.Cir.1982) (surveying the dangers of allowing isolated floor comments, unsupported by other elements of legislative history or statutory language, decisive effect)
 
 
 [11]
 Union Carbide argues that, because Holz Pond--the Union Carbide facility described by Senator Randolph in the colloquy--cannot practicably be emptied of hazardous wastes, the colloquy must have been intended to specifically forbid a close-or-empty requirement such as that embodied in the 1989 closure regulations. See Petitioner's Brief at 26 n. 8. However, even taking Union Carbide's word on the feasibility of emptying Holz Pond, Senator Randolph never articulated that assumption in his comments, and so Senator Chafee's response cannot be assumed to have taken it into account
 
 
 [12]
 Both of these provisions were added as floor amendments and thus were not discussed in the Committee reports
 
 
 [13]
 The Conference Committee Report stated only that "[t]he conference substitute contains elements of both the House bill and the Senate amendment, modified as discussed below. Existing surface impoundments must come into compliance with the minimum technology requirements for new surface impoundments...." H.R.Conf.Rep. No. 1133, 98th Cong., 2d Sess. 98 (1984), U.S.Code Cong. & Admin.News 1984, pp. 5576, 5669
 
 
 [14]
 The RCRA defines "storage" as "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste." 42 U.S.C. Sec. 6903(33). The term "disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. Sec. 6903(3)
 
 
 [15]
 Section 3005 of the RCRA, which was a part of the RCRA when it was originally enacted in 1976, governs the issuance of permits to owners and operators of facilities used for the "treatment, storage, or disposal" of hazardous wastes. It thus makes sense that Congress, in adding Sec. 3005(j) in 1984, would advert to this terminology
 
 
 [16]
 It is true that the EPA has interpreted Sec. 3005(j) to bar only the continued receipt of hazardous wastes for storage, rather than barring the storage of hazardous wastes already accumulated. See supra note 7. It is entirely conceivable, however, that a similar construction would have been placed on the term "maintain" had the House bill's language prevailed
 
 
 [17]
 In addition to surface impoundments, Secs. 264.113 and 265.113 apply to landfills, tank systems, waste piles, incinerators, and land treatment facilities that receive hazardous wastes. See 40 C.F.R. Parts 264 and 265
 
 
 [18]
 To the extent that the 1986 closure regulations were superseded by the 1989 regulations, we need look only to the latter. There is no indication in the record that Union Carbide or any other operator of a hazardous waste surface impoundment suffered injury, or in any way altered its operations, due to reliance on a provision of the 1986 closure regulations later revised in the 1989 regulations
 
 
 [19]
 Union Carbide asserts that it does not challenge the need for eventual closure and capping of unretrofitted facilities, but only the need for immediate closing of unretrofitted facilities that are not emptied of accumulated hazardous wastes. The EPA's rationale, however, addresses this question directly: Immediate closure or emptying is required because the accumulation of non-hazardous wastes on top of hazardous wastes creates a significant risk that a pressure head will form and cause a rupture of the impoundment and consequent release of hazardous wastes
 
 
 [20]
 The EPA summarized its research and conclusions on that occasion as follows:
 Surface impoundments containing hazardous waste pose a particular threat of contaminating ground water and have always been one of the chief concerns of the hazardous waste management program. (See generally, the Background Document [to] Subpart K Interim Status Standards, April 28, 1980.) Not only is containment without a liner system usually impossible, but wastes are present as liquids or are constantly in the presence of liquids. This creates the situation most conducive to forming leachate. In addition, the collected liquids in an impoundment will form a pressure head, causing downward dispersion of the leached contaminants. Since most impoundments are unlined, and because many are underlain by permeable soils, the potential for downward seepage of contaminated fluids into ground water is high. In fact, incidents of ground water contamination from impoundments have been reported in nearly all states. Thirty-eight of the first 160 Superfund interim priority list sites involve leaching from unsecured surface impoundments.
 Surface impoundments also can contaminate surrounding soil and surface water by directly releasing the contaminated liquid via washout, overtopping, or dike breakage. Volatilization of organic contaminants also can pollute air in areas surrounding the impoundment.
 In addition to referencing the Background Document, the EPA also footnoted in this passage several studies and reports supporting this analysis.