852 F.2d 574
 27 ERC 2225, 271 U.S.App.D.C. 276, 57
USLW 2075,
18 Envtl. L. Rep. 21,194
 STATE OF NEW YORK, et al., Petitioners,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY and William
Ruckelshaus, Administrator, Respondents,
Monongahela Power Company, the North American Coal
Corporation, NACCO Mining Company, Cincinnati Gas
& Electric Company, et al., Peabody
Holding Company, et al., Intervenors.
COMMONWEALTH OF PENNSYLVANIA, State of New York and State of
Maine, Petitioners,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY and Lee Thomas, Acting
Administrator, Respondents,
Peabody Holding Company, et al., Cincinnati Gas & Electric
Company, et al., North American Coal Corporation,
et al., Monongahela Power Company,
Tennessee Valley Authority, Intervenors.
 Nos. 84-1592, 85-1082.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 26, 1988.
Decided July 22, 1988.
 
 Gregory W. Sample, Augusta, Me., and Thomas Y. Au, Harrisburg, Pa., with whom Robert Abrams, Atty. Gen. of N.Y., David R. Wooley, Asst. Atty. Gen. of N.Y., Albany, N.Y., James M. Shannon, Atty. Gen. of Mass., Lee Breckenridge, Asst. Atty. Gen. of Mass., Boston, Mass., J. Wallace Malley, Jr., Asst. Atty. Gen. of Vt., Manchester, Vt., Paul H. Schneider, Deputy Atty. Gen. of N.J., Trenton, N.J., Richard Ottinger, and James E. Tierney, Atty. Gen. of Me., Augusta, Me., were on the joint brief, for petitioners. Robert Whitehead, Jr., Kenneth N. Tedford, Hartford, Conn., and Francis X. Bellotti, also entered appearances for petitioners.
 Michael A. McCord, Atty., Dept. of Justice, with whom Roger J. Marzulla, Acting Asst. Atty. Gen., Alan W. Eckert, Associate Gen. Counsel, E.P.A., and Charles S. Carter, Atty., E.P.A., Washington, D.C., were on the brief, for respondents. Peter Everett, Margaret N. Strand and Michael W. Steinberg, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 
 
 1
 Edward Berlin, with whom was Vern R. Walker, for Cincinnati Gas & Elec. Co., et al.; James R. Bieke, Frederick C. Schafrick, Washington, D.C., for Peabody Holding Co., Inc., et al.; Ronald R. Janke, Cleveland, Ohio, for North American Coal Corp. and NACCO Min. Co.; Michael H. Holland and Earl R. Pfeffer, Washington, D.C., for amicus curiae Intern. Union, United Mine Workers of America were on the joint brief for intervenors Cincinnati Gas & Elec. Co., et al. Thomas M. Lemberg, Washington, D.C., also entered an appearance for Cincinnati Gas & Elec. Co., et al.
 
 
 2
 Lawrence A. Demase, Pittsburgh, Pa., and J. Daniel Hull, were on the brief for intervenor, Monongahela Power Co.
 
 
 3
 Edward S. Christenbury, Gen. Counsel, James E. Fox, Deputy Gen. Counsel, Thomas C. Doolan and Gregory R. Signer, Knoxville, Tenn., were on the brief for intervenor Tennessee Valley Authority. Herbert S. Sanger, Knoxville, Tenn., also entered an appearance for intervenor Tennessee Valley Authority.
 
 
 4
 Before RUTH BADER GINSBURG and SENTELLE, Circuit Judges, and PALMIERI,* Senior District Judge.
 
 
 5
 Opinion for the Court filed by Circuit Judge SENTELLE.
 
 
 6
 Separate concurring opinion filed by Circuit Judge RUTH BADER GINSBURG.
 
 SENTELLE, Circuit Judge:
 
 7
 Petitioners challenge the Environmental Protection Agency's (EPA) denial of petitions filed by three eastern states under section 126(b) of the Clean Air Act ("the Act"). 42 U.S.C. Sec. 7426(b). We find that the EPA denial of these petitions is based on a reasonable interpretation of the relevant statutes and is not arbitrary or capricious. We therefore deny the petitions, with the exception of the petition of the state of New York which we remand to the Agency for the submission of new data.
 
 I. BACKGROUND
 
 8
 The Clean Air Act establishes joint state and federal responsibility for control of the nation's air pollution. 42 U.S.C. Secs. 7401-7642 (1982). Sections 108 and 109 of the Act, 42 U.S.C. Secs. 7408 and 7409, grant authority to EPA to set national ambient air quality standards (NAAQS) limiting permissible concentrations of air pollutants. Pursuant to this statutory authority the EPA has established NAAQS for a number of pollutants, including the NAAQS for sulfur oxides, measured as sulfur dioxide (SO2 ), 40 C.F.R. Sec. 50.4, and for particulate matter, measured as total suspended particulate matter ("TSP"), 40 C.F.R. Sec. 50.7 (1984). On July 1, 1987, EPA promulgated a new particulate matter standard--the PM10 standard--which replaced the TSP standard. 52 Fed.Reg. 24,634.
 
 
 9
 Section 110 of the Act, 42 U.S.C. Sec. 7410, requires that within nine months after the promulgation or revision of an NAAQS each state must adopt and submit to the Administrator a plan providing for the implementation, maintenance, and enforcement of the standard in each air quality control region within the state. Within four months after the required submission of each state implementation plan ("SIP"), the EPA approves or disapproves the plan based on, among other things, the eleven criteria set forth in Secs. 110(a)(2)(A)-(K) of the Act. 42 U.S.C. Secs. 7410(a)(2)(A)-(K). Subsequent revision to an SIP is subject to approval by the same criteria. 42 U.S.C. Sec. 7410(a)(3).
 
 
 10
 The requirements of Sec. 110 include provisions dealing with certain types of interstate air pollution. Obviously, air movement across state borders is inevitable and the Act does not purport to bar interstate pollution but rather requires each SIP to contain measures
 
 
 11
 (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement[.]
 
 
 12
 42 U.S.C. Sec. 7410(a)(2)(E).
 
 
 13
 Section 126(b) of the Act provides that any state "may petition the Administrator for a finding that any major source emits or would emit any air pollutant in violation of the prohibition of Sec. 7410(a)(2)(E)(i)[.]" 42 U.S.C. Sec. 7426(b). EPA then has sixty days from the receipt of the Sec. 7426(b) petition to hold a public hearing and either make the requested finding or deny the petition, notwithstanding any permit granted by the state in which the source is located or intends to locate. 42 U.S.C. Secs. 7426(b), 7426(c). Upon a finding of such violation of Sec. 110(a)(2)(E), no new or modified source can be built or operated in violation of the Act's interstate requirements and existing sources must either cease operations within three months or submit to a schedule designed to ensure compliance with controlled requirements eliminating the impermissible interstate pollution as expeditiously as practicable. 42 U.S.C. Sec. 7426.
 
 
 14
 The administrative decision challenged herein involved EPA's disposition of petitions under section 126(b) filed by Pennsylvania, New York and Maine. Separate section 126 petitions filed by the three states in 1980 and 1981 alleged violations of NAAQS and impaired visibility within the borders of each state, substantially attributable to the cumulative impact of SO2 emissions in seven midwestern states. In the atmosphere, SO2 gas is transformed into tiny particles known as sulfate.[1] Thus the above reference EPA NAAQS for SO2 and particulate matter are both implicated in this instance by the same pollution sources.
 
 
 15
 The initial petition, filed by Pennsylvania on December 19, 1980, sought a determination that 38 specific sources in Ohio and West Virginia prevented attainment and maintenance of the SO2 ambient standards in four Pennsylvania counties and its southwestern air quality region. On December 22, 1980 and January 16, 1981, New York filed nine petitions alleging that 19 specific sources in the states of Illinois, Indiana, Michigan, Ohio, Tennessee and West Virginia were preventing attainment and maintenance of the TSP standard in New York. EPA consolidated the petitions and scheduled a hearing for June 18 and 19, 1981. Two weeks before the hearing, Pennsylvania supplemented its petition and expanded its allegations to include all major emitters of SO2 in Ohio, West Virginia, Illinois, Indiana and Kentucky. At the hearing, New York submitted a list of 59 sources and later amended its petition to include all sources of SO2 and particulates under SIPs in the six states it originally named and Kentucky.
 
 
 16
 After the hearing, Maine filed its petition on October 7, 1981, alleging that SO2 derived sulfate particulates were interfering with its ability to prevent significant deterioration (PSD) and protect visibility as required by 42 U.S.C. Secs. 7470-7491 (Part C requirements incorporated by reference in 42 U.S.C. Sec. 7410(a)(2)(E)(i)(II)). Maine alleged that a "regional haze" at Acadia National Park was the responsibility of all "SO2 sources in the seven mid-western states cited by New York and Pennsylvania" and confessed an inability to trace the effects to any specific source or list of sources. The further proceedings on the three petitions were consolidated.
 
 
 17
 After extensive proceedings on the three petitions, including an eleven month comment period which closed in May of 1982, the three petitioning states sued in United States District Court seeking an order requiring EPA to decide the petitions. That court ordered EPA to render a decision on the petitions within 60 days. State of New York v. Ruckelshaus, 21 Env't Rep.Cas. (BNA) 1721 (D.D.C. October 5, 1984). On December 10, 1984, EPA published a denial of each state's petition. 49 Fed.Reg. 48,152, 48,157. The states then filed these petitions for review pursuant to the judicial review section of the Clean Air Act. 42 U.S.C. Sec. 7607.
 
 II. ANALYSIS
 A. EPA's Duty Under Section 126(b)
 
 18
 EPA has interpreted Sec. 126(b) as requiring that four elements be met before relief will be provided. Those elements are: (1) Section 126(b) provides relief with respect to only those pollutants for which National Ambient Air Quality Standards have been set or PSD or visibility measures required; (2) Section 126(b) provides redress for violations alleged to have occurred in specified geographic areas; (3) Section 126(b) provides relief with respect to interstate pollution that results in the violation of an NAAQS or PSD increment, or interferes with required SIP measures to protect visibility; and (4) Where an NAAQS or PSD increment or proscribed visibility impairment occurs, the out-of-state source or sources must make a significant contribution to the levels of pollution causing that violation or impairment. 49 Fed.Reg. 34,856-58.
 
 
 19
 Petitioners argue that Sec. 126(b) provides a statutory mechanism to implement an affirmative duty, created by Sec. 110(a)(2), to review existing SIPs to determine whether the SIPs are adequate to prevent impermissible interstate impacts. Specifically, Petitioners contend that the filing of their section 126(b) petitions immediately obliged EPA to take the investigatory steps necessary to determine whether the SIPs in all named upwind states were in compliance with Sec. 110(a)(2)(E).
 
 
 20
 Section 110(a)(2)(E) prescribes substantive standards against which the interstate impacts of SIPs must be judged. The Administrator contends that his responsibility to evaluate SIPs for compliance with Sec. 110(a)(2)(E) is linked to his review of an otherwise required submission by a state. In other words, the Administrator contends that Sec. 110(a)(2)(E) does not require reevaluation and revision of existing SIPs, and that a section 126(b) petition does not trigger such review. We agree.
 
 
 21
 Petitioners' argument centers on the contention that the substantive inquiry under Sec. 126(b) is the same as that under Sec. 110(a)(2). See Connecticut v. EPA, 656 F.2d 902, 907 (2d Cir.1981). If indeed it is the same substantive inquiry, and we will assume for these purposes it is, then the language of Sec. 126(b) supports the Administrator's interpretation of Sec. 110(a)(2)(E).
 
 
 22
 The language of Sec. 126(b) is quite specific and focuses on "major sources," not the validity of a state's SIP: "Any State or political subdivision may petition the Administrator for a finding that any major source emits or would emit any air pollution in violation of the prohibition of section 7410(a)(2)(E)(i) of this title." 42 U.S.C. Sec. 7426(b) (emphasis added). The elements EPA has derived from Sec. 126(b) are reasonable and therefore, this Court will not disturb EPA's interpretation. Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 23
 Congress specified that the Administrator take final action on a section 126(b) petition very quickly: "Within 60 days after receipt of any petition under this subsection and after public hearing, the Administrator shall make such a finding or deny the petition." 42 U.S.C. Sec. 126(b) (emphasis added). Under Petitioners' theory, once a section 126(b) petition has been filed, the Administrator would be required to engage in an entire array of investigative duties. In particular, the Administrator would be required to undertake a full-scale investigation of the adequacy of the SIPs of all states named in the petition for all pollutants involved, to conduct whatever data-gathering and research is necessary to either prove Petitioners' claims or affirmatively disprove their allegations, and to develop whatever new air pollution models are necessary to confirm or affirmatively disprove Petitioners' modeling theories, as well as conducting a public hearing, analyzing the evidence presented by all interested parties, proposing a determination, considering all comments submitted and promulgating a final rule--all within 60 days of receipt of the petition.[2] It is reasonable to conclude that Congress did not intend that the Administrator be required to perform all these duties in such a short period of time in the absence of the clearest expression. See Chevron, 467 U.S. 837, 104 S.Ct. 2778.
 
 
 24
 In addition, the language of Sec. 110(a)(2) resists Petitioners' interpretation and conversely, lends support to the Administrator's. Section 110(a)(2) contains no language expressly directing the Administrator to reevaluate existing SIPs. When Congress has intended to establish a requirement for direct EPA action it has said so. In 1977, Congress explicitly ordered the promulgation of EPA regulations addressing a variety of matters, including new source performance standards, noncompliance penalties, stack height credit, and visibility protection requirements. 42 U.S.C. Secs. 7411(f), 7420(a), 7423(c), 7491(a)(4). The statute also directs EPA to undertake other actions, including periodic reassessments of existing ambient standards and new source performance standards. See 42 U.S.C. Secs. 7409(d)(1), 7411(b)(1)(B).
 
 
 25
 In one instance Congress specifically directed EPA to investigate the adequacy of existing SIPs. Section 124 of the Act, which is entitled "Assurance of adequacy of State plans," expressly requires EPA to review the adequacy of existing plans with regard to dependence by major fuel burning sources on petroleum products and natural gas. 42 U.S.C. Sec. 7424. That section, unlike Sec. 110(a)(2)(E), sets up a procedure for accomplishing the task. Again, where Congress wanted EPA to review the adequacy of existing SIPs, it said so. Against that backdrop, Congress' silence in Sec. 110(a)(2)(E) is significant.
 
 
 26
 Not only is Sec. 110(a)(2)(E) itself devoid of any requirement for direct action by the EPA, but the legislative history is similarly barren. If any Congressional intent can be divined from this silence, it must be an intent not to require affirmative action. If Congressional intent cannot be determined then we must defer to EPA's construction of the statute so long as it is a permissible one. Chevron, 467 U.S. 837, 104 S.Ct. 2778.
 
 
 27
 Petitioners attempt to rely on Sec. 406(d)(2) (which is not codified) of the 1977 Amendments, 42 U.S.C. Sec. 7401 (note), as the basis for an independent duty to review all existing SIPs and require revisions where necessary to conform to Sec. 110(a)(2)(E). They argue that Sec. 406(d)(2) required that within one year of enactment of the 1977 Amendments, the states had an obligation to revise their SIPs in accordance with Sec. 110(a)(2)(E). The Administrator contends, and again we agree, that Sec. 406(d)(2) only sets the timetable for actions to revise an SIP "by reason of any amendment made by this Act." Section 406(d)(2) itself creates no independent obligation to revise an SIP; it merely addresses the timing of SIP revisions separately required by other provisions of the 1977 Amendments. See generally Sierra Club v. EPA, 719 F.2d 436, 469 (D.C.Cir.1983). Section 406(d)(2) provides no support for Petitioners' argument.
 
 
 28
 The Administrator's review of various SIP revisions submitted by states is an ongoing process, and under the Administrator's interpretation the prohibition of Sec. 110(a)(2)(E) is one of the requirements that must be met before he can approve any initial SIP or revision. Because the Administrator's construction of Sec. 110(a)(2) is consistent with the plain language of that provision and is a reasonable one, this Court must accept it. Chemical Mfrs. Ass'n v. NRDC, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); Chevron, 467 U.S. 837, 104 S.Ct. 2778.
 
 B. The Petitions
 
 29
 Petitioners' position before this Court so thoroughly relied on their misconception that Secs. 110 and 126 of the Act imposed a duty on the EPA to review SIPs that the affirmance of the Administrator's interpretation of those statutes is largely dispositive of the issues argued before us; nonetheless, we will address the Agency's treatment of each state's petition. In none of the three instances was the denial arbitrary or capricious.
 
 Maine
 
 30
 Maine presented evidence that, under certain weather conditions, sulfate particles transported from seven midwestern states caused the formation of "regional haze" that impairs visibility at Acadia National Park, an area where visibility is specially protected under Sec. 169A of the Act. 42 U.S.C. Sec. 7491. EPA denied the petition because "Maine had not adopted the required visibility measures contained in the Federal regulations; moreover, such visability measures at this time do not address regional haze." 49 Fed.Reg. 48153; see State of Vermont v. Thomas, 850 F.2d 99 (2d Cir.1988) (current regulations do not encompass federally enforceable measures to alleviate "regional haze").
 
 
 31
 Because Maine's claims in this proceeding concern only the problem of regional haze, Maine has not presented any claim which falls within the ambit of Sec. 126(b), which incorporates the substantive standard of Sec. 110(a)(2)(E). In other words, Maine does not allege that major sources in any other states are interfering with visability measures contained in its SIP--its SIP does not contain regional haze visibility measures. Maine has failed to make even a threshold showing of entitlement under Sec. 126(b).[3] Therefore, EPA properly denied Maine's petition.
 
 Pennsylvania
 
 32
 Pennsylvania's challenge to EPA's action on its petition is now directed to three particular areas in southwestern Pennsylvania. The sole question is whether EPA was justified in not concluding that SO2 emissions from major sources in Ohio and West Virginia prevented attainment or maintenance by Pennsylvania of the NAAQS for SO2 in the subject areas.
 
 
 33
 The three areas are located in the West Virginia-Ohio border area (Border area), the Beaver Valley Air Basin (Beaver Valley area) and the Monongahela Valley Air Basin (Monongahela Valley area). Pennsylvania submitted no actual monitoring data showing violations of the SO2 standards in the Border area. It relied on a modeling study (Cramer Study), commissioned by the EPA, which purported to predict violations in that area. The state argues that the Cramer Study represents the best modeling techniques available.
 
 
 34
 Because the Border area was not included in the original area of the Cramer Study, EPA contends that the results for that area are subject to several problems. Although violations of the SO2 standard were predicted, the results were only "preliminary" due to questionable meteorological assumptions and questions regarding the accuracy of the emissions inventories for the out-of-state sources used in the model. In fact, the author of the Cramer Study conceded that additional work would be needed before firm results could be obtained. EPA thoroughly analyzed the Cramer Study and its applicability to the Border area and concluded that it did not provide a reasonable basis for determining that SO2 violations were occurring in that area.
 
 
 35
 It is well established that when a court is reviewing predictions within an agency's area of special expertise, at the frontiers of science, the "court must generally be at its most deferential." Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). "[A]s long as Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence." Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1505 (D.C.Cir.1986). Acceptance or rejection of a particular air pollution model and the results obtained from it are interpretations of scientific evidence. This Court cannot say that the Administrator's rejection of the Cramer Study was in any way unreasonable.
 
 
 36
 The Cramer Study did not predict a violation in the Beaver Valley area and Pennsylvania submitted no monitoring data showing an actual violation. It was therefore reasonable for the EPA to deny the section 126(b) petition with regard to the Beaver Valley Area.
 
 
 37
 Pennsylvania failed to submit any monitoring data showing an actual violation in the Monongahela Valley area. The Cramer Study predicted a violation at one site in that area, which was one of the areas covered by the original study. However, EPA estimated that more than 80% of the SO2 contributing to the predicted violation would come from Pennsylvania sources, and that therefore the out-of-state sources did not "significantly contribute" to the violation. Once again this Court is being asked to second-guess the scientific judgments of the EPA. Once again, we are at our "most deferential." Baltimore Gas, 462 U.S. at 103, 103 S.Ct. at 2255. And, once again, we cannot say that the EPA's assessment of the scientific evidence was unreasonable. Therefore, Pennsylvania's petition will be denied.
 
 New York
 
 38
 On July 1, 1987, EPA promulgated a new national ambient air quality standard for particulate matter which replaces the previous TSP standards. EPA contended in its brief that New York's claim had been mooted by this change and that, therefore, New York's petition should be dismissed.
 
 
 39
 However, at oral argument, EPA raised no objection to a remand for submission of new data rather than dismissal with leave to re-petition. Therefore, we remand New York's petition (and New York's petition only) for submission of new data relevant to the new NAAQS.
 
 III. CONCLUSION
 
 40
 The Administrator's interpretation of Sec. 110(a)(2)(E) and Sec. 126(b) is consistent with the statutory language and is reasonable. The section 126(b) petitions of Maine and Pennsylvania were properly rejected by the EPA; accordingly, we deny Maine's and Pennsylvania's petitions for review. New York's petition is remanded for reconsideration in light of the revised TSP NAAQS.
 
 
 41
 It is so ordered.
 
 
 42
 RUTH BADER GINSBURG, Circuit Judge, concurring:
 
 
 43
 I join fully in Judge Sentelle's opinion and write separately only to spotlight a reality that the language of the Clean Air Act condones. As counsel for the EPA acknowledged at oral argument, the EPA has taken no action against sources of interstate air pollution under either Sec. 126(b) or Sec. 110(a)(2)(E) in the decade-plus since those provisions were enacted. Congress, when it is so minded, is fully capable of instructing the EPA to address particular matters promptly. See, e.g., section 124 of the Act, 42 U.S.C. Sec. 7424, added by the 1977 amendments (Administrator shall review state implementation plans with regard to dependence of major sources on petroleum products and natural gas within eighteen months of August 7, 1977); court's opinion at 578. Congress did not supply such direction in this instance; instead, it allowed and has left unchecked the EPA's current approach to interstate air pollution. The judiciary, therefore, is not the proper place in which to urge alteration of the Agency's course.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 National Academy of Sciences, "Atmosphere Biosphere Interactions: Toward a Better Understanding of the Ecological Consequences of Fossil Fuel Combustion," 1981, pp. 62-63, 144 (Joint Appendix at p. 0570)
 
 
 [2]
 With the possibility of extension pursuant to section 307(d)(10), 42 U.S.C. Sec. 7607(d)(10)
 
 
 [3]
 To the extent that Maine is asserting that regional haze requirements must be in SIPs, this constitutes an untimely attack on the 1980 regulations. Such an attack is barred by Sec. 307(b)(1) of the Act, which requires that judicial review be brought within 60 days of a final action by EPA. 42 U.S.C. Sec. 7607(b)(1); Group Against Smog and Pollution v. EPA, 665 F.2d 1284, 1289 (D.C.Cir.1981)
 To the extent Maine is implicitly arguing that EPA should be compelled to promulgate regulations dealing with regional haze, its claim is beyond the jurisdiction of this Court. A nondiscretionary duty to take action under the Act can only be enforced in a federal district court suit pursuant to Sec. 304(a)(2). 42 U.S.C. Sec. 7604(a)(2).