**ATOCHEM NORTH AMERICA, INC. and Sherex Chemical Company, Inc., Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.**

**Civ. A. No. 90–2905 (RCL).**

United States District Court, District of Columbia.

March 12, 1991.

Mark E. Newell, Robert M. Sussman, Latham & Watkins, Washington, D.C., for plaintiffs.

Bradley Campbell, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, D.C., for defendant; Philip J. Ross and Mark A. Dyner, U.S. E.P.A., of counsel.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on defendant's motion for summary judgment and plaintiffs' cross-motion for summary judgment. After consideration of the motions, the oppositions, and reply memoranda, and the record herein, defendant's motion for summary judgment is granted and plaintiffs' motion for summary judgment is denied.

## BACKGROUND

*Introduction*

Tributyltin ("TBT") is a compound belonging to the organotin (organic tin) family. Used as an ingredient in marine antifouling paint, TBT repels and retards the growth of barnacles, algae, and other encrusting organisms that create resistance on the bottom of marine vessels, reducing vessel speed and fuel efficiency. The benefits of TBT–based antifoulants are not, however, without cost. Studies show that even at low concentrations, TBT compounds are toxic to nontarget marine and freshwater organisms.[1]

On March 22, 1989, the EPA issued a Data Call–In (DCI) notice to all TBT manufacturers and antifoulant paint suppliers requiring compliance with a ten year TBT monitoring program. The program requires current TBT marine antifoulant paint registrants to conduct extensive sampling of sediment, water, and aquatic organisms. Compliance with the DCI is an express condition of continued registration.

On November 21, 1990, after a year and a half of negotiations with the EPA, plaintiffs[2] filed this suit and a motion for preliminary injunction challenging the lawfulness of the DCI. Following a hearing before the court, plaintiffs withdrew their preliminary injunction motion after the court set an expedited schedule for consideration of dispositive motions and defendant delayed action until this court's ruling. The court now considers both parties' motions for summary judgment.

## REGULATORY FRAMEWORK

TBT sale and use is governed by two statutes, one generally applicable to pesticides and one specific to organotin compounds. The first, the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136–136y (1988), requires the registration of all pesticides sold or distributed in the United States. 7 U.S.C. § 136a(a). In order to register, the applicant must demonstrate that the product can be used without causing "unreasonable adverse effects on the environment" 7 U.S.C. 136a(c)(5)(D), which is defined as without causing "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). In order to meet this burden, FIFRA requires applicants to file with the EPA sufficient data to allow the Agency "to make regulatory judgments about the risks and benefits of various kinds of pesticide products." 40 C.F.R. § 158.20(b)(1) (1990).

Under FIFRA, EPA may also require "additional data" to support existing registrations of pesticides. 7 U.S.C. § 136a(c)(2)(B)(i). To collect this additional information, the EPA issues to current registrants a Data Call–In Notice (DCI) which requires the registrant to produce within 90 days evidence that it is taking steps to gather the requested information. 7 U.S.C. 136a(c)(2)(B)(ii). If the registrant fails to take appropriate steps within the designated time frame, the EPA may issue a notice of intent to suspend the registration. 7 U.S.C. § 136a(c)(2)(B)(iv). The proposed suspension becomes final after 30 days from receipt of the notice of intent to sus-

---

**1.** *See* 33 U.S.C. § 2401(a)(2) (1988).

**2.** Plaintiffs are the sole United States suppliers of TBT active ingredients used in antifouling paint. Together they form the Consortium of TBT Manufacturers.

pend unless the registrant requests a hearing within that period. *Id.* At the hearing, the validity of the additional data requirement may not be challenged: the only matter for consideration is "whether the registrant has failed to take the action that served as the basis for the notice of intent to suspend the registration of the pesticide for which additional data is required." *Id.*

The second regulatory statute governing TBT, the Organotin Antifouling Paint Control Act (OAPCA), 33 U.S.C. §§ 2401–2410 (1988), was enacted in June, 1988 to address environmental concerns about the effects of TBT. OAPCA requires the EPA to certify that antifouling paints on the market containing organotin have release rates at or below 4.0 micrograms per square centimeter per day[3] and specifically bans the use of the paints on vessels less than 25 meters in length.[4] In addition to restrictions on the kinds of paints permitted and their use, OAPCA imposes on EPA a ten year TBT monitoring obligation[5] and requires the Navy to monitor on a periodic basis organotin levels in the home ports of any Navy vessel coated with antifoulant paint containing organotin.[6]

*TBT Special Review*

In January, 1986, prior to the enactment of OAPCA, EPA initiated a Special Review[7] of TBT antifoulant registrations. In

a notice in the Federal Register, 51 Fed. Reg. 778 (1986), Joint Appendix (hereafter J.A.) 110–11, EPA cited toxicity studies on the effects of TBT on aquatic organisms and solicited comments on the risks and benefits of TBT use. The Federal Register notice also referred to a technical support document which stated that the EPA would issued a DCI under section 3(c)(2)(B) of FIFRA requiring, among other information, TBT environmental monitoring data. J.A. 101. The DCI was issued on July 29, 1986 and required all registrants of TBT antifouling paints and producers of the TBT active ingredients to provide "product chemistry data, ecological effects data, environmental fate data, TBT paint release rate data, worker exposure data, quantitative use and application data, and efficacy data." J.A. 421.

In October, 1987, after consideration of the public comments received in response to the 1986 Federal Register notice, the EPA issued a Preliminary Determination to Cancel Certain Registrations of Tributyltin (PD 2/3) 52 Fed.Reg. 37,510 (1987), J.A. at 112–21. The Preliminary Determination proposed to cancel the registration of certain TBT products and deny the applications of new TBT registrants unless certain conditions were met.[8] At the same time,

**3.** 33 U.S.C. § 2405 (1988).

**4.** Vessels less than 25 meters in length coated with antifoulant paint account for a large amount of the organotin released into the water. *33 U.S.C. § 2401(a)(3)*. OAPCA does, however, make exception for aluminum hulled vessels less than 25 meters and for the use of antifoulant paint on the outboard motor or lower drive unit of vessels less than 25 meters. *33 U.S.C. § 2403(b)*.

**5.** Section 2406(a) requires the Administrator to "monitor the concentrations of organotin in the water column, sediments, and aquatic organisms of representative estuaries and near-coastal waters in the United States. This monitoring program shall remain in effect until 10 years after June 16, 1988. The Administrator shall submit a report annually to [Congress] detailing the results of such monitoring program for the preceding year." 33 U.S.C. § 2406(a).

**6.** 33 U.S.C. § 2406(b).

**7.** The Special Review is a procedure by which the EPA gathers information to assess the risks

and benefits of a pesticide. Through notices and the issuance of support documents, the EPA announces its positions and solicits comments from interested parties. If the agency concludes that the risks of the pesticide outweigh its benefits, the Agency can initiate action under FIFRA to cancel, suspend and/or modify the terms and conditions of registration. For an explanation of the formalities and statutory authority for the Special Review mechanism see J.A. 113–14.

**8.** The Agency proposed to (1) cancel all TBT antifouling paint registrations which exceed an average daily release rate of 4.0 micrograms per square centimeter per day; (2) prohibit the use of TBT antifouling paints on all non-aluminum vessels under 65 feet and require appropriate labelling; (3) classify TBT antifouling paints as restricted use pesticides and restrict their sale to certified commercial applicators; (4) require compliance with specified directions for use, application, and disposal. *See* 52 Fed.Reg. 37,-518 (1987), J.A. 120.

the Agency issued "Tributyltin Special Review Technical Support Document and a Draft Notice of Intent to Cancel," a compendium of the scientific and technical information supporting the Agency's preliminary conclusions. J.A. 122–290. The support document, in its final paragraph, referred to a Data Call–In Notice that "will be issued shortly requiring TBT registrants to conduct a three to five year monitoring study of U.S. waters which will provide information on the extent and levels of TBT concentrations in the aquatic environment and impact of TBT on indicator organisms in situ." J.A. 256.

In June of the following year, Congress enacted OAPCA and announced standards and prohibitions on TBT use more stringent than those proposed in the EPA's PD 2/3. In October, 1988, EPA issued a Partial Conclusion of the Special Review, taking into consideration OAPCA's requirements and comments and data received during the Special Review process. 53 Fed.Reg. 39,-022 (1988), J.A. 421–40. EPA concluded that it would cancel the registrations and deny applications for registrations of antifouling paints containing TBT unless the terms of OAPCA and certain additional labelling and use restrictions were met. J.A. 422, 436–38. In addition, section VII, "Future Activities Regarding Tributyltin Antifoulant Paints," emphasized the need for continued study of the environmental effects of TBT and mentioned that in addition to outstanding DCIs, the Agency would issue DCIs by late 1988 "which will require TBT registrants to conduct multiyear and multistate monitoring studies." J.A. 436.

*Development of Monitoring Data*

EPA efforts to develop a TBT data monitoring program began in late 1988. In November, 1988, EPA issued a 16 page TBT monitoring program entitled "Guidance for Protocol Development." J.A. 441–56. EPA sent copies of the document for comment to 37 parties, including members of the EPA, other federal agencies, state agencies, environmental groups, and universities. J.A. 457–61. Plaintiffs did not receive a copy of the proposal.

On March 22, 1989, EPA issued a DCI notice instructing all TBT antifoulant registrants to provide within 90 days written commitment to perform ten year monitoring studies on TBT levels in seven regions nationwide. The DCI required sampling from different sites within each region, the establishment of several monitoring stations within each site, and testing of water, sediment, and tissue. J.A. 509–539. The introduction to the DCI cautioned that "If you do not respond to this Notice, or if you do not satisfy EPA that you will comply with its requirements, or should be exempt or excused from doing so, then the registration of your product(s) subject to this Notice will be subject to suspension." J.A. 509.

Plaintiffs, the only registered suppliers of the TBT active ingredient used in TBT antifoulant paints,[9] responded with a letter to EPA questioning the lawfulness of the DCI and requesting a prompt meeting with the agency to discuss technical issues and cost concerns. J.A. 569–70. Plaintiffs proffered that "[a]t this meeting, M & T[10] would present in detail its concerns about the monitoring obligations in the DCI and would be prepared to discuss possible alternatives." J.A. 570.

Before consenting to a meeting, EPA requested that plaintiffs provide an agenda of issues to be discussed and a proposal of an alternative monitoring program. J.A. 571–72, 580–81. After plaintiffs submitted a draft of a proposed monitoring program, J.A. 587–600, the Agency agreed to defer the DCI commitment date in order to allow plaintiffs to prepare a detailed outline of its proposed monitoring program. J.A. 604. Upon receipt of plaintiffs' proposal, "Protocol Outline: National Monitoring Program

---

**9.** Twelve other firms hold FIFRA registrations to formulate TBT into end-use products, however, they may be exempt from the TBT monitoring requirements under FIFRA's "formulator exception." 7 U.S.C. § 136a(c)(2)(D). *See* Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment (hereafter EPA SJ) at 3 n. 2.

**10.** M & T Chemicals was merged into plaintiff Atochem North America Inc. in December of 1989.

for Tributyltin and Its Primary Degradation Intermediates," J.A. 610–62. EPA agreed to meet plaintiffs on July 26–27, 1989. J.A. 666–67. During and after the meeting, plaintiffs impressed upon EPA their belief that without major cost-cutting alterations to the DCI requirements, plaintiffs would be unable to comply. J.A. 673. Plaintiffs also suggested that EPA, the Department of Navy and/or the Department of Commerce provide supplemental funding to defray the cost of the testing program. J.A. 676.

In the months following the meeting, EPA scrutinized plaintiffs' proposed monitoring plan and on May 17, 1990 issued a statement modifying the DCI to enable the plaintiffs "to conserve resources while maintaining the scientific and statistical integrity of the monitoring program." J.A. 752.[11] Plaintiffs responded to the EPA with letters emphasizing that even in its modified form, compliance with the DCI would be economically prohibitive. J.A. 777. After another meeting in which cost concerns were discussed, the Agency announced on October 24, 1990 that it would not amend the DCI further. J.A. at 830–40. In follow-up correspondence with the agency, plaintiffs continued to protest the cost of the program and requested a deferral of the DCI commitment deadline. J.A. 842–46. EPA refused plaintiffs' request and this litigation followed.

## ANALYSIS

Plaintiffs, in their motion for summary judgment, raises four broad objections to the DCI: (1) the EPA lacks the statutory authority to require registrants to conduct a TBT monitoring program; (2) the agency's issuance of the monitoring DCI violated the Administrative Procedure Act's (APA) requirements and due process; (3) the agency violated FIFRA by refusing to consider the economic costs of the monitor-

ing requirement; and (4) the Agency acted in an arbitrary and capricious manner by failing to justify the need for and terms of the comprehensive monitoring program set out in the DCI.

### I. Construing the Meaning of "Monitor" in FIFRA and OAPCA

Plaintiffs contend that the plain language of FIFRA and OAPCA obligates EPA *itself* to monitor TBT levels and precludes the agency from transferring this burden to registrants. Specifically, plaintiff points to the language of Section 7(a) of OAPCA and section 20 of FIFRA:

*Estuarine Monitoring—The Administrator*, in consultation with the Under Secretary of Commerce for Oceans and Atmosphere, *shall monitor* the concentrations of organotin in the water column, sediments, and aquatic organisms of representative estuaries and near-coastal waters in the United States. This monitoring program *shall remain in effect until 10 years* after June 16, 1988. *The Administrator shall submit a report annually* to [Congress] detailing the results of such monitoring program for the preceding year. 33 U.S.C. § 2406(a). (emphasis added)

*Monitoring.—The Administrator shall undertake such monitoring activities*, including, but not limited to monitoring in air, soil, water, man, plants, and animals, *as may be necessary for the implementation of this subchapter* and of the national pesticide monitoring plan. 7 U.S.C. 136r(c) (emphasis added).

Plaintiffs argue that because the language of both acts instructs that the "Administrator shall" monitor, implementation of a program which places the burden of data collection on plaintiffs exceeds the agency's authority.[12]

11. EPA accepted plaintiffs' proposed methodology for sampling and quality assurance, but refused to accept many of plaintiffs' cost-saving modifications. J.A. 752–70.

12. Additionally, plaintiffs contend that the magnitude and duration of the DCI's monitoring requirements preclude EPA from labelling them

as "additional data" under 7 U.S.C. § 136a(c)(2)(B)(i). Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross–Motion for Summary Judgment (Hereafter "Plaintiffs' SJ") at 18–19.

Defendant EPA, on the other hand, contends that nothing in the language of the statutes imposes on the agency the responsibility to gather data itself or limits the agency's right to transfer monitoring duties to registrants. First, EPA maintains that since neither OAPCA nor FIFRA defines the term "monitor" or specifies whether the duty to monitor "carries with it a concomitant duty to produce,"[13] the agency may satisfy its § 7 obligations by placing on registrants the task of data collection. To buttress this interpretation, defendant points to portions of the legislative history of OAPCA which refer specifically to registrant financing of the ten year monitoring program and EPA use of FIFRA's DCI procedure to collect the monitoring data.[14]

■ The standard of judicial review for an agency's construction of its statutory authority is a deferential one. The Supreme Court in *Chevron, U.S.A. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) set out the two step analysis which this court must employ. The first step of the *Chevron* analysis requires the reviewing court to decide "[i]f Congress had an intention on the precise question at issue."[15] If traditional tools of statutory interpretation and legislative history cannot allow a court to conclude that Congress' intent was clear, the second step of

the *Chevron* analysis requires the court to "defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purposes."[16]

■ After examination of the language and legislative history of OAPCA and FIFRA, this court cannot conclude that Congress considered the precise issue of wholesale EPA delegation of data collection and monitoring duties to TBT registrants. Although defendant's citations to House and Senate Committee reports do suggest that Congress considered EPA's use of the FIFRA DCI mechanism and transfer of monitoring duty to registrants, ambiguities which plaintiffs point to in the legislative record[17] cast doubt on the definitiveness of EPA's reading of the legislative history. Bearing in mind, however, the fact that EPA is construing a statute which Congress intended the agency to administer, this court finds the agency's interpretation of OAPCA and FIFRA to be reasonable. Indeed, acceptance of the literal reading of the statutes which plaintiffs urge would require this court to strip EPA of a large measure of discretion and place on Congress the impossible burden of articulating with specificity the fashion in which it wishes to have its goals realized. Under the principles articulated by *Chevron*, this form of judicial second-guessing of agency statutory interpretation is improper when,

13. EPA SJ at 25.

14. *See id.* at 25–26 referring to the House Committee Report H.R.Rep. No. 400, 100th Cong. 1st Sess. at 9–10 (1987), U.S.Code Cong. & Admin. News 1984, pp. 671, 677 ("It is the understanding of the Committee that the EPA, under the authority of FIFRA, presently has the authority to require registrants of antifouling paints to undertake or finance environmental monitoring programs. The Committee in no way intends to undercut this authority, and encourages the EPA to use existing authorities to augment the bill so as to achieve a sensible implementation of this section...."), a letter from the Congressional Budget Office reprinted in the House Report (" '[t]he monitoring functions mandated by Section 7 are ... not expected to increase federal costs because they would most likely be carried out (as they would have been under current law) by registrants of organotin-containing substances....' " *Id.* at 13, U.S.Code Cong. & Admin.News 1984, p. 680 (quoting letter from Edward M. Gramlich to

Hon. Walter B. Jones, Chairman, House Committee on Merchant Marine and Fisheries (Sept. 23, 1987)), and a similar letter reprinted in the Senate Committee report ("monitoring functions required of the EPA by section 6 [of the Senate Bill] are not likely to increase costs because they would most likely be carried out (as they would have been under current law) by registrants of organotin-containing substances....") (quoting letter from James Blum to Hon. Quentin N. Burdick, Chairman, Senate Committee on Environment and Public Works (December 3, 1987)) S.Rep. No. 237, 100th Cong., 1st Sess. at 9 (1987).

15. *Chevron, U.S.A. v. NRDC*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984).

16. *Chem. Mfrs. Ass'n v. EPA*, 919 F.2d 158, 162–63 (D.C.Cir.1990).

17. *See* Plaintiffs' SJ at 16–17.

as here, the agency's construction is reasonable in light of the language and purpose of the statute.

## II. Data Call–In and Proper APA Procedure

Plaintiffs contend that even if EPA had the statutory authority to issue the DCI, it did so in violation of the Administrative Procedure Act. Plaintiffs insist that, contrary to defendant's characterization of the DCI as the product of informal adjudication, the DCI is a rule intended to have general applicability and should therefore have been issued in compliance with the notice and comment requirements of § 553.

Plaintiffs' classification of the DCI as a rule has some logical force. Section 551(4) of the APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." [18] Although the DCI at issue in this case does bear the earmarks of a "rule," general correlation with the APA definition does not establish dispositively that the DCI is a rule. For example, despite the fact that prospectivity is generally an attribute of rules, courts have upheld agency orders which impact policy and have general prospective application. [19]

Defendant presents an entirely different characterization of the DCI and offers plausible reasons why the agency chose to proceed through adjudication. First, EPA points out that the DCI applies only to a limited number of FIFRA registrations for TBT. Of the twenty TBT compounds registered as pesticidal active ingredients, only

nine are registered for use in antifoulant paints. J.A. 70. The data gathering requirements announced for TBT marine antifoulant paint registrants do not impose data requirements on the other TBT registrants. Second, the implementation of technical standards to achieve broadly stated statutory goals is the type of agency action which the Court of Appeals for this Circuit has noted is properly accomplished through adjudication. [20]

The applicable law governing the rulemaking versus adjudication decision, is well settled. Just as the Supreme Court has insisted that courts defer to reasonable agency constructions of organic statutes, it has emphasized that the choice between rulemaking or adjudication "lies primarily in the informed discretion of the administrative agency," [21] unless Congress mandates otherwise. This general principle, first announced by the Supreme Court in 1947 in *SEC v. Chenery Corp.* has been broadly interpreted and is firmly entrenched.

Plaintiffs acknowledge the heavy weight of *Chenery* and its progeny, but insist that *Chenery* governs only in "the situation where an agency adjudicates the past and present obligations of particular parties by construing *already existing standards;* the issue decided was that it was proper to apply such decisions retroactively to the parties in the adjudicatory proceeding, rather than requiring the agency to initiate a general rulemaking to announce that interpretation for the future." [22] Despite plaintiffs' efforts to qualify the relevance and broadness of the *Chenery* ruling, the court refuses to accept plaintiffs' invitation to ignore the general principle for which

---

**18.** 5 U.S.C. 551(4) (1988).

**19.** *See e.g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974) (holding that the Board was "not precluded from announcing new principles in an adjudicative proceeding."); *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947); *Chisholm v. FCC,* 538 F.2d 349, 365 (D.C.Cir.1976), *cert. denied, Democratic Nat'l Comm. v. FCC,* 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976).

**20.** *See Amer. Cyanamid Co. v. Food and Drug Admin.,* 606 F.2d 1307, 1320 (D.C.Cir.1979) (stating "FDA may, on a case-by-case basis, define and narrow the statutory requirement of adequate tests by announcing and applying particular principles of scientific methodology.")

**21.** *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).

**22.** Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of Plaintiffs' Cross–Motion for Summary Judgment at 6.

*Chenery* stands, namely, that the choice between rulemaking and adjudication should be left to agency discretion, subject to court review for abuses of discretion.

■ Although the court agrees with plaintiffs that the type of requirements and standards enunciated in the DCI are of the variety that might best have been promulgated after notice and comment, it is not the prerogative of either plaintiffs or the court to demand that the agency proceed in such a fashion. Since the court finds that Congress did not require EPA to proceed by rulemaking and that EPA did not abuse its discretion by choosing to proceed by way of adjudication, the court concludes that the agency was not required to comply with § 553 of the APA.

### III. DCI and Due Process

■ Related to plaintiffs' § 553 argument is their assertion that the agency's failure to make specific findings on the economic data submitted by plaintiffs and refusal to disclose the Agency's own estimates of the cost of implementing the program announced in the DCI constitute a violation of due process. Plaintiffs assert that "[t]o the extent EPA purported to make an individualized adjudication of each of the plaintiffs' entitlement to a [sic] economically-based waiver from the DCI, that determination was subject to the minimum due process requirements of notice and an opportunity to be heard." [23]

In order to raise a valid due process argument, plaintiffs must demonstrate that a cognizable liberty or property interest

has been subject to deprivation. In this case, the data gathering requirements specified in the DCI do not in themselves divest plaintiffs of a property interest. Although the failure to obey the DCI will impact plaintiffs' registration—a recognized property interest [24]—until such deprivation occurs, the court need not consider plaintiffs' due process argument.[25]

Even assuming, however, that plaintiffs have been deprived of a cognizable property interest, their due process claim would still have to be rejected because plaintiffs have not demonstrated why additional procedures are justified.[26] In this case, plaintiffs were given notice of the issuance of the DCI [27] and several opportunities to raise concerns over the cost and technical requirements of the DCI. The agency considered plaintiffs' objections and in response significantly modified the DCI. Given the detailed procedural history of this case and EPA's apparent good faith throughout, it is difficult to see how requiring notice and comment at this point would shed new light on the issue or improve the quality of decisionmaking.[28] Since the court finds that plaintiffs have been afforded adequate procedural protections and that the imposition of formal notice and comment cannot be justified in terms of either cost or time or quality of decisionmaking, plaintiffs' due process challenge is denied.

### IV. Section 706 Review of EPA's Decision to Issue and Enforce the DCI

Under the APA, court review of agency actions are governed by § 706 which states

---

**23.** Plaintiffs' SJ at 31.

**24.** *See Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971) (holding driving licenses to be "property" protected by the 14th Amendment.)

**25.** *See Wells Fargo Armored Serv. Corp. v. Georgia Pub. Serv. Comm'n,* 547 F.2d 938, 941 (5th Cir.1977) (holding that privileges, licenses, certificates, and franchises qualify as property interests for purposes of procedural due process, but that due process only becomes relevant where such property is "deprived.").

**26.** *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (holding that court review of due process challenges require consideration of three factors: (1) the

private interest that will be affected by the official action; (2) the fairness and reliability of the existing pretermination procedures, and the probable value, if any of additional or substitute procedural safeguards; and (3) the public interest, including the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.)

**27.** *See* J.A. 256, 436.

**28.** *See Chisholm v. FCC,* 538 F.2d 349, 365 (D.C. Cir.1976) (holding that requiring notice and comment "is not required where the record demonstrates that the agency in fact has had the benefit of petitioners' comments.").

that the court shall "(2) hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [29] Under this standard of review, plaintiffs allege that the court should not enforce EPA's DCI because the agency (1) did not engage in a cost-benefit analysis as required by FIFRA before issuing the DCI and (2) enacted data gathering requirements which exceed the bounds of reasonableness without adequate justification.

### A. FIFRA and Cost/Benefit Assessment Requirements

■ Plaintiffs posit that by refusing to consider the consequences of the DCI data gathering requirements—namely, the likely elimination of the product from the market—EPA failed to consider a "relevant factor" [30] and acted in contravention of FIFRA.

Section 7 U.S.C. § 136(bb) states that in assessing whether a product has "unreasonable adverse effects on the environment," EPA must take into account "the economic, social, and environmental costs and benefits of the use of any pesticide." [31] Plaintiffs argue that the cost/benefit analysis referred to in 7 U.S.C. § 136(bb) is an overarching principle of FIFRA and applies to EPA decisions pursuant to 7 U.S.C. 136a(c)(2)(B)(ii) to issue data gathering requirements so onerous that suspension or cancellation of the registration is inevitable. Under this interpretation of the statute, EPA was required to balance the need for information on the risks of the pesticide against the possibility that the product might cease to be produced if the data requirements are enforced.

If Congress had included the cost/benefit language of § 136(bb) in 7 U.S.C. 136a(c)(2)(B)(ii), the court's work would be greatly simplified. Nowhere in § 136a(c)(2)(B)(ii), however, is there a requirement of cost-justified decisionmaking. Moreover, as defendant points out, at the same time that Congress omitted the cost/benefit language from § 136a(c)(2)(B)(ii), it included the cost/benefit requirement in other sections of the statute.[32]

Defendant maintains, additionally, that from a policy perspective, the imposition of cost/benefit analysis on DCI decisions would frustrate the agency's ability to perform the cost/benefit assessment statutorily mandated for registration, suspension, and cancellation decisions. As the defendant notes, "[U]nder plaintiffs' reading of the statute, when a useful but extremely hazardous pesticide is produced by firms that are marginal or suffering financial losses, EPA can never learn of the hazard because the Agency would not be able to ask for data on toxicity." [33]

The inconsistent appearance of cost/benefit language in the statute overall,[34] buttressed by defendant's policy and structure arguments, make EPA's reading of FIFRA's cost/benefit requirement a permissible one. Although plaintiffs' reading is also plausible, the *Chevron* principles discussed above forbid the court to reject a reasonable agency construction. Accordingly, the court does not find that EPA was required to do a cost-benefit analysis of the

---

**29.** 5 U.S.C. § 706(2)(A) (1988).

**30.** *See Citizens to Preserve Overton Park, Inc., v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (holding that a court reviewing an informal adjudication "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.").

**31.** 7 U.S.C. § 136(bb) (1988).

**32.** *See* 7 U.S.C. 136a(c)(5) and 7 U.S.C. 136d(b) which explicitly require risk-benefit analysis under the "unreasonable adverse effects" standard.

**33.** EPA SJ at 33.

**34.** *See Russello v. U.S.,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972) "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

consequences of the issuance of the DCI prior to its issuance.

### B. Court Review of the Substance of the DCI

Plaintiffs state in their memorandum for summary judgment that the requirements of the DCI are "unusually stringent, if not unprecedented.... Taken together, they comprise a monitoring program of unique duration, size, and complexity that vastly exceeds the Government's normal practice when its own funds are at stake." [35] Plaintiffs contend that by failing to provide explanations for why the requirements are necessary and why a less rigorous program (e.g. the alternative proposed by plaintiffs) would not suffice, EPA has acted arbitrarily and capriciously, in violation of the APA.

■ The requirements of the TBT monitoring program are undeniably extensive. In assessing scientific judgments by the expert agency, however, the court must "generally be at its most deferential" [36] and should not "second-guess the scientific judgments of the EPA." [37] In this case, the court has no reason to question the scientific validity of the agency's determinations. Review of the record amply demonstrates that the agency has offered clear statements of the objectives of the TBT monitoring program, J.A. 753–55, and provided scientific rationales for the principal technical features of the TBT monitoring program: sampling at two water depths, prohibition of sample compositing, and use of transplanted organisms. J.A. 752–68, 832–33, 838. Plaintiffs point to differences between other testing programs and the one at issue in this case,[38] but disparities in requirements among these testing schemes are easily explained by the differing purposes of each program.[39] In sum, the court sees no reason to question the scientific merit of the agency's determination of TBT testing standards. The EPA did "examine the relevant data and articulate a satisfactory explanation for its action" [40] and did not act arbitrarily or capriciously.

### CONCLUSION

In conclusion, the court finds that EPA has the authority to issue the DCIs which place on plaintiffs the duty to perform the ten year TBT monitoring requirements required by OAPCA. The court finds that in this case, the agency acted properly and within its discretion to issue the monitoring standards by informal adjudication, rather than through rulemaking. Finally, the court finds that neither the mode of agency decisionmaking nor the substance of the DCI were arbitrary or capricious.

For the reasons set forth above, the court this date shall enter the accompanying order granting the defendant's motion for summary judgment and denying plaintiffs' motion for summary judgment.

### ORDER

Upon consideration of plaintiffs' and defendant's motions for summary judgment, and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that defendant's motion for summary judgment is granted, and it is further

**35.** Plaintiffs' SJ at 41–43.

**36.** *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983).

**37.** *State of New York v. EPA*, 852 F.2d 574, 580 (D.C.Cir.1988), *cert. denied, Maine v. EPA*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989).

**38.** Plaintiffs refer specifically to the National Oceanic and Atmospheric Administration (NOAA) Status and Trends Contaminant Program, the U.S. Fish and Wildlife Service's National Contaminant Biomonitoring Program, EPA's Environmental Monitoring and Assessment Program (EMAP) and the U.S. Navy's Tributyltin Monitoring Program. Plaintiffs' SJ at 42.

**39.** *See* Memorandum of Points and Authorities in Opposition To Plaintiffs' Motion for Summary Judgment and Reply in Support of Defendant's Motion for Summary Judgment at 39. *See e.g.*, J.A. 836–37.

**40.** *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

ORDERED, that plaintiffs' motion for summary judgment is denied, and it is further

ORDERED, that summary judgment is entered for defendant, and this case is hereby DISMISSED WITH PREJUDICE.

SO ORDERED.