John FONTANA, et al., Plaintiffs,

v.

Louis CALDERA, et al., Defendants.

No. CIV. A. 00–1732.

United States District Court,
District of Columbia.

Sept. 5, 2001.

Charles William Gittins, Law Offices of Charles W. Gittins, P.C., Middleton, VA, Louies Bouscaren McKnew, Rockville, MD, for Plaintiffs.

Stacey M. Ludwig, Paul Mussenden, U.S. Attorney's Office, Washington, DC, for Defendants.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

Plaintiffs John Fontana and Kevin Murphy filed motions for preliminary and permanent injunction, seeking to prevent enforcement of a decision of the Army Board for Correction of Military Records ("ABCMR"), endorsing the Army's calculation of their separation from service date. Defendants filed a motion for summary judgment. After filing stipulations, the Magistrate Judge treated the party's filings as cross-motions for summary judgement, and found in favor of the plaintiffs. Before the court is the Magistrate Judge's Report and Recommendation, defendant's objections thereto, and plaintiffs' reply. Defendants' motion for summary judgment is **GRANTED**; plaintiffs' motion for preliminary injunction or summary judgment is **DENIED**; plaintiff Fontana's motion for temporary restraining order is **DENIED**.

### I. Background

Plaintiffs are lieutenant colonels currently serving on active duty in the Army as medical doctors at Walter Reed Medical Center ("WRMC"). They commenced their military careers at the United States Military Academy at West Point ("West Point") in 1979, when they signed an agreement to complete an Active Duty Service Obligation ("ADSO") in return for their undergraduate education ("West Point Service Agreement"). After graduating in 1983, plaintiffs signed another agreement upon entering the Uniform Services University of Health Sciences ("USUHS"), incurring additional ADSOs, in exchange for medical training that ultimately resulted in both obtaining medical degrees ("USUHS Service Agreement").

Though plaintiffs performed some active duty after graduating from USUHS independent of their graduate education, they also completed an internship, a residency,

and a fellowship, all pursuant to separate ADSO agreements with the Army. Each of those graduate ADSO agreements provided an anticipated separation from service date, and additional conditions on the service of the new ADSOs incurred.[1] Though they signed these agreements, plaintiffs submitted written protests regarding both the separation from service date and the additional conditions. Plaintiffs also allege that the Army's interpretation of their separation from service dates has been inconsistent.

In May of 1999, plaintiffs submitted their resignations. Though each plaintiff's commanding officer recommended approval, the Department of Army Personnel Command refused to accept the resignations. Plaintiffs filed applications for correction of their personnel records with the Army Board for Correction of Military Records in November 1999, and both applications were denied in May and June of 2000.

Plaintiffs dispute the manner in which the Army has calculated their ADSOs. The parties do not dispute the aggregate of ADSOs incurred, but only when and if those ADSOs were fulfilled. Plaintiffs contend that the West Point ADSOs were fulfilled during their required active duty service at USUHS. Defendants dispute this interpretation of the two service agreements and related statutes and regulations, arguing that both preclude concurrent service of the ADSO while plaintiffs attended USUHS.

Plaintiffs further contend that the service agreements they signed at the inception of their internships, residencies, and fellowships, barring the toll of ADSOs for the duration of each, were in conflict with relevant statutes and cannot be enforced. The defendants dispute this interpretation,

and further argue that the letters the plaintiffs sent regarding the unenforceability of the service agreements are not relevant and should not affect the court's holding. Plaintiffs contend they had fulfilled their ADSOs on the date they submitted their resignations. However, according to the Army, Lt. Fontana is not due to be released from service until April 1, 2005, and Lt. Murphy is not due for release until March 29, 2006.

After the case was referred to Magistrate Judge John Facciola, pursuant to Federal Rule of Civil Procedure 72(b) and Local Rule 72,3(a), the Magistrate Judge obtained stipulated facts from the parties on critical issues and subsequently treated plaintiffs' motion for preliminary injunction as a cross-motion for summary judgment. The Magistrate Judge filed his Report and Recommendations on May 14, 2001, defendants filed their objections on May 29, 2001, and plaintiffs filed their reply on June 11, 2001.

Plaintiff Fontana filed a motion for Temporary Restraining Order on May 25, 2001, asking the court to restrain the Army from executing a permanent change of duty station order, removing him to Fort Bragg in North Carolina. Defendants agreed to stay the execution of the order pending a decision by the court on the merits of the pending issues.

## II. Discussion

### A. Standard of Review

**1. Magistrate Judge's Report and Recommendation Must Be Reviewed *De Novo* on All Dispositive Issues Raised by the Opposing Party in Their Objections.**

■ Defendants argue that the Magistrate Judge's Report and Recommendation

---

**1.** These conditions varied, some agreements provided for additional ADSOs, and some merely required that no ADSO owed for previous education could be served when completing the internship, residency or fellowship.

must be reviewed *de novo* by this Court. The district court judge "shall make a *de novo* determination of those portions of a magistrate judge's findings and recommendations to which objection is made ..." L.Cv.R. 72.3(c) (2001); *See also* Fed. R. Civil P. 72 (2001); *Aikens v. Shalala,* 956 F.Supp. 14, 19 (D.D.C.1997) (objections to a report and recommendation of a magistrate judge on an SSA claim must be reviewed *de novo* ). Defendants raised objections to the standard of review applied by the Magistrate Judge, as well as the Magistrate Judge's application and interpretation of the relevant service agreements, 10 U.S.C. § 4348, 10 U.S.C. § 2114, Army Regulation 350–100, and D.O.D. Directive 6000.2. All issues raised by the defendants in their objections shall be reviewed *de novo* by this Court.

**2. ABCMR's Determination is Based on Statutory and Regulatory Interpretation to Which Considerable Deference Should be Given Instead of the *De Novo* Standard of Review Applied in the Magistrate's Order.**

 The Army Board for Correction of Military Records is composed of civilians who evaluate service-members' claims of error or injustice in their military records. *See Dickson v. Secretary of Defense,* 68 F.3d 1396, 1399 (D.C.Cir.1995). The ABCMR derives its authority, as do similar boards in the other military branches, from 10 U.S.C. § 1552(a)(1), which states:

The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice ... [S]uch corrections shall be made by the Secre-

tary acting through boards of civilians of the executive part of that military department.

10 U.S.C. § 1552(a)(1) (2000). Under the statute, the Secretary has discretion to correct military records when he "considers it necessary to correct an error," but is not automatically required to correct a record when there is an error. *Id.* Despite this grant of discretion, courts have held that a decision by the ABCMR to correct or not to correct a military record pursuant to this authority is a reviewable agency action under the APA.[2] *Frizelle v. Slater,* 111 F.3d 172, 176 (D.C.Cir.1997) (ABCMR decision that failed to respond to two of plaintiff's arguments for rescission of Officer Effectiveness Report is arbitrary capricious and contrary to law under the APA); *Dickson v. Secretary of Defense,* 68 F.3d 1396, 1404 (D.C.Cir.1995) (ABCMR decision not to grant waiver of three year limitation on applications for review is arbitrary and capricious under the APA); *Kreis v. Secretary of Air Force,* 866 F.2d 1508, 1514 (D.C.Cir.1989).

Decisions of the ABCMR are reviewable under § 706 of the APA. 5 U.S.C. § 706(2)(A) (2000). Section 706 provides that a reviewing court should overturn agency action it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* The Supreme Court has explained that this language does not require the same standard of review to be applied to all types of agency decisions in all contexts. Rather, in reviewing agency decisions under § 706, the standard of review to be applied depends on whether the question decided by the agency was one of fact, law, or the

---

**2.** The ABCMR is an agency for purposes of the APA. *See Dickson,* 68 F.3d at 1404; 5 U.S.C. § 701(b)(1) (2000)(defining "agency" to include "each authority of the Government."). The APA does exempt some military actions, but those exceptions are not relevant here. See § 701(b)(1)(F) (court martials and military commissions) and 5 U.S.C. § 701(b)(1)(G) (military authority exercised in time of war).

application of law to facts and whether the agency was interpreting a statute or rule. *See, e.g., Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (clarifying scope of *Chevron*); *Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (articulating standard for rule interpretation); *Chevron v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (explaining standard for statutory interpretation). Determining the proper standard to be applied to the ABCMR's decision by this Court requires a close analysis of exactly what issues are in dispute here.

The issues in dispute in this case are questions of law, not fact. Plaintiffs and defendants have stipulated to the basic facts of this case. *See* Joint Stipulation and Statement of Material Facts and Issues. The parties disagree as to the proper interpretation of the applicable statutes, Army regulations, and the Service Agreements between plaintiffs and the Army. Thus, this Court must apply the appropriate standard of review for agency interpretations of statutes and regulations that occur in a decision-making process such as the one employed by the ABCMR.

### a. *Chevron* applies to the ABCMR's Statutory Interpretation.

■ The Plaintiffs challenge the ABCMR's statutory interpretation here, arguing that the ABCMR did not correctly interpret the applicable statutes, 10 U.S.C. § 4348 and § 2114, in determining that plaintiffs' West Point ADSOs were not satisfied during their time at the USUHS. Because it appears that Congress generally delegated to the ABCMR the power to make decisions carrying the force of law, the appropriate standard of review for the

ABCMR's statutory interpretation is the *Chevron* standard. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778 (1984); *United States v. Mead,* 533 U.S. 218, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001).

Despite several recent cases discussing the scope of the *Chevron* doctrine, the Supreme Court has not directly decided the issue of whether *Chevron* deference should apply per se to informal as well as formal adjudication.[3] *See Mead,* 533 U.S. 218, 121 S.Ct. 2164, 2179, 2183, 150 L.Ed.2d 292 (Scalia, J., dissenting)(pointing out that majority decision does not clarify whether *Chevron* applies to informal adjudication). While *Chevron* itself involved a formal rule-making process under the APA, the Supreme Court has since held that courts should apply *Chevron* to agency interpretations of law that occur during the adjudication of claims as well. *See De Bartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (*Chevron* applies to questions of law in agency adjudications as well as rule-making). The Supreme Court in *Christensen v. Harris County* made clear that Chevron applies in the context of formal adjudication under the APA. 120 S.Ct. at 1662 (holding that Chevron applies to statutory constructions announced in formal adjudication and notice-and-comment rule-making). The *Christensen* Court held that *Chevron* deference is not warranted for "opinion letters," "policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law ..." 120 S.Ct. at 1662. The majority in *Christensen* left open the question of whether *Chevron* deference applies to an agency's interpretation of law that occurs in an informal adjudication. Lower courts have

---

**3.** The proceeding at issue in this case was an informal adjudication because the statute authorizing the ABCMR's decision, 10 U.S.C. § 1552, does not require that a hearing occur with notice and on the record. 5 U.S.C. § 554(a) (2000).

applied *Chevron* to agency statutory interpretation that occurs in informal adjudications. *See, e.g., Mountain Side Mobile Estates P'ship v. Secretary of HUD,* 56 F.3d 1243, 1247 (10th Cir.1995)(holding that the *Chevron* standard is the same regardless of whether the agency interpretation is performed through rulemaking or informal adjudication); *City of Kansas City, Missouri v. Dep't of Hous. and Urban Dev.,* 923 F.2d 188, 192 (D.C.Cir.1991)(recognizing in dicta that *Chevron* applies to agency statutory interpretation in informal adjudication); *see also* Kenneth C. Davis and Richard J. Pierce, Jr., *Administrative Law Treatise,* Cumulative Supplement § 3.5 (3d ed.2000). In addition, this Court has held that "an agency's interpretation of a statute is entitled to deference, even in the informal adjudicatory setting." *Modern Muzzle-loading, Inc. v. Magaw,* 18 F.Supp.2d 29, 34 (D.D.C.1998); *see also, e.g., Seafarers Int'l Union v. United States,* 891 F.Supp. 641, 646 (D.D.C.1995) (assuming the applicability of *Chevron* by applying it to informal adjudication); *Atochem North America, Inc. v. EPA,* 759 F.Supp. 861, 867–68 (D.D.C.1991) (same).

■ However, in *United States v. Mead,* the Supreme Court recently clarified the applicability of the *Chevron* doctrine to informal agency decision-making processes. The *Mead* Court held that the applicability of *Chevron* turns not on a category of decision-making process such as informal adjudication, but rather on the extent of the authority delegated by Congress in the statute authorizing the agency decision:

> We hold that administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that

the agency interpretation claiming deference was promulgated in the exercise of that authority.

121 S.Ct. at 2171. According to the *Mead* Court, sufficient delegation of authority will be clear where the adjudication or rule-making occurs according to formal procedures, but in the case of informal processes, the delegation may be shown "by some other indication of a comparable congressional intent." 533 U.S. at ——, 121 S.Ct. at 2171. While the Court did not elaborate further on these other indications, the Court in *Mead* refused to apply *Chevron* deference to a tariff classification ruling by the United States Customs Service, when the authorizing statute expressly provided for review of these decisions by the Court of International Trade, the Customs Services did not treat these rulings as binding on third parties, and other importers were warned against assuming any right of reliance on these decisions. 533 U.S. at ——, 121 S.Ct. at 2174.

Applying the same totality of the circumstances test to the authorizing statute in this case, 10 U.S.C. § 1552, it is clear that Congress intended for the ABCMR's decisions to have the force of law. As discussed above, 10 U.S.C. § 1552(a)(1) grants discretion to the Secretary of a military department to correct any military record "when the Secretary considers it necessary to correct an error or remove an injustice." § 1552(a)(1). These corrections are to be made under procedures established by the Secretary concerned. § 1552(a)(3). Most importantly, "[e]xcept when procured by fraud, a correction under this section is final and conclusive on all officers of the United States." § 1552(a)(4). Because unlike in *Mead,* Congress' intent here to delegate conclusive decision-making authority to the departments of the military is clear from Subsection (a)(4), this Court should apply

*Chevron* deference to the ABCMR's statutory interpretation.

■ Under *Chevron,* in reviewing an agency interpretation of law, a court applies a two-step analysis: first, if Congress has directly spoken on the issue, a court must give effect to unambiguously expressed intent of Congress; second, if statutory gaps remain, a court must give effect to the agency's interpretation unless it is arbitrary and capricious or manifestly contrary to statute. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778; *Nat'l Pub. Radio v. FCC,* 254 F.3d 226, 228 (D.C.Cir.2001). Thus, here, this Court must determine whether or not the ABCMR's decision that plaintiffs' West Point ADSOs did not toll during their USUHS medical education is contrary to the express language of the applicable statutes. If there is no such conflict, the Court must then decide whether the ABCMR's interpretation is arbitrary and capricious.

■ In applying this second step of *Chevron,* an agency's decision is arbitrary and capricious when it is contrary to law or when the agency's process in rendering its decision was irrational or unsupported by the record. *See Wolfe v. Marsh,* 835 F.2d 354, 358 (D.C.Cir.1987); *see e.g., Dickson,* 68 F.3d 1396, 1403–04 (D.C.Cir. 1995) (failure to provide a rationale for decision not to grant waiver is arbitrary and capricious); *Smith v. Dalton,* 927 F.Supp. 1, 6–7 (D.D.C.1996) (corrections board decision finding an error but refusing to correct it without explanation was arbitrary and capricious).

**b. ABCMR's Interpretation of Regulations Should be Upheld Absent Clear Conflict with Plain Text of Regulation.**

■ In addition to the statutory question raised here, plaintiffs challenge the Army's interpretation of the applicable regulations. The appropriate standard of review for the ABCMR's interpretation of the Army's regulations, as reflected in the Service Agreements with the plaintiffs and the ABCMR's decision, is a clear error standard. *See Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Gen. Elec. Co. v. EPA,* 53 F.3d 1324, 1327 (D.C.Cir.1995). In other words, unless the ABCMR's interpretation clearly conflicts with the plain language of the Army regulations, this Court should defer to that interpretation.

■ In reviewing the ABCMR's interpretation of the Army's regulations, this Court should accord even more deference to that decision than would be required by *Chevron* for statutory interpretation. *See Consarc Corp. v. Treasury Dep't,* 71 F.3d 909 (D.C.Cir.1995) (agency interpretation of rule is due more deference than agency interpretation of authorizing statute). Reviewing courts should accord an agency's interpretation of its own regulations a "high level of deference," and defer to that interpretation "unless it is plainly wrong." *General Carbon Co. v. OSHRC,* 860 F.2d 479, 483 (D.C.Cir.1988); *see also Auer,* 519 U.S. at 461, 117 S.Ct. 905 (holding that an agency's interpretation of a rule is "controlling unless plainly erroneous or inconsistent with the regulation"). Under this standard, courts must defer to an agency's interpretation as long as it is "logically consistent with the language of the regulation[s] and . . . serves a permissible regulatory function." *Gen. Elec.,* 53 F.3d at 1327 (*quoting Rollins Envtl. Serv. Inc. v. EPA,* 937 F.2d 649, 652 (D.C.Cir.1991)). This standard of deference requires a court to defer to an agency's interpretation of a rule even when that interpretation diverges from what a first-time reader might conclude was the "best" interpretation of the regulation. *Gen. Elec.,* 53 F.3d at 1327. Even when a plaintiff offers a

more plausible interpretation of a regulation, it is the "agency's choice [that] receives substantial deference." *Id.* (*quoting Rollins*, 937 F.2d at 652). Thus, if the Army's interpretation of its regulations is a plausible interpretation of the plain language of those regulations, then this Court will defer to the ABCMR's decision.

Even if the ABCMR's decision was unclear with respect to the Army's precise interpretation of statutes and regulations, and that imprecision was only clarified in the course of papers filed in this litigation, those litigating positions are to be accorded deference. Recognizing the dangers of allowing post hoc rationalizations for agency action, the D.C. Circuit has held that even where an agency's interpretation of a regulation is advanced for the first time in litigation, the reviewing court should defer to that interpretation if it reflects the "agency's fair and considered judgment on the issue." *Nat'l Wildlife Fed'n v. Browner*, 127 F.3d 1126 (D.C.Cir.1997). There is nothing in the record that indicates that the Army's position with respect to the interpretation of the applicable regulations is anything other than its "considered opinion." The Army has not offered conflicting interpretations in other cases. *Id.* And as discussed below, the Army drafted service agreements with the plaintiffs that do reflect the Army's offered interpretation of its regulations.

**c. This Court Should Review the Army's Interpretation of the Service Agreements for Consistency with Regulations.**

■ The status and interpretation of the two Service Agreements between the plaintiffs and the Army are further questions of law in dispute. The ABCMR interpreted the language of those agreements as consistent with the then-current statutes and regulations. As discussed

above, plaintiffs dispute the Army's interpretation of those statutes and regulations, but also dispute the Army's interpretation of the language of the Service Agreements.

The question of the enforceability of the Service Agreements had those agreements conflicted with the Army's statutes and regulations would be a question of law for this court to determine *de novo*. As explained below, this case does not raise such an issue because the agreements can reasonably be interpreted as consistent with the Army's interpretation of its regulations.

Neither the Magistrate Judge, plaintiffs, nor the defendants have employed the correct standard of review. The Magistrate Judge held that this case was a matter of statutory interpretation, and did not involve "questions of military discipline," or of promotions, and therefore should be reviewed *de novo*. Though plaintiffs originally advocated a remedial arbitrary and capricious standard, they concurred with the Magistrate Judge's Recommendations on that issue in their response to defendants' objections. The Magistrate Judge's ruling that the present case "involves only the interpretation of contracts, statutes and regulations," and, therefore, is a matter of judicial expertise, not military discretion, accurately describes the issue in contention, but overlooks the applicability of the *Chevron* doctrine. The cases the Magistrate Judge cited in support of a *de novo* standard are clearly distinguishable. *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Defense*, 87 F.3d 1356 (D.C.Cir. 1996) (Department of Defense requirement that bidders on a travel agency concession include an estimated contribution to a "Morale" fund is subject to *de novo* review); *Doe v. Sullivan*, 938 F.2d 1370 (D.C.Cir.1991) (Department of Defense interpretation of F.D.A. rule allowing waiver of informed consent requisite to adminis-

tration of unapproved drugs is not entitled to any deference). Both *Doe* and *Scheduled Airlines* involved agencies interpreting statutes outside of their area of expertise. In such instances, the rationale for *Chevron* deference does not apply. In contrast, the ABCMR was interpreting Army and Department of Defense Regulations, as well as statutes that were designed by Congress specifically for the armed forces.

In contrast to the *de novo* standard employed by the Magistrate Judge and advocated by the plaintiffs, defendants argue that an unusually deferential version of the arbitrary and capricious standard is appropriate for ABCMR decisions involving personnel matters. Defendants' contention that this Circuit applies an unusually deferential version of the arbitrary & capricious standard to decisions involving military personnel is misguided. *See Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1513–14 (D.C.Cir.1989) (military personnel decision is reviewable under A.P.A., but only under "unusually deferential" application of "arbitrary or capricious standard."). In *Kreis*, the Circuit Court decided what standard to apply to a reviewable exercise of agency discretion, not an agency's interpretation of its statutes and regulations. Defendant's invocation of the *Schaefer* case on this point is similarly unpersuasive. *Schaefer v. Cheney*, 725 F.Supp. 40 (D.D.C.1989). This Court in *Schaefer* upheld an ABCMR decision not to recalculate ADSOs owed by medical students for Army sponsorship. In doing so, this Court did not indicate that any greater degree of deference was due than that traditionally recognized under the Administrative Procedures Act; in fact, this Court did not explicitly discuss the standard of review. Instead, this Court appeared to review the rationality of the Army's interpretation of Army Regulation 601–112, concluding that "[t]his Court

finds the Defendants' interpretation of their 1972 regulation persuasive." *Id.* at 50. Thus, the usual standards applied in reviewing agency interpretations of statutes and regulations, rather than an unusually deferential version of the arbitrary and capricious standard, are appropriate here.

## B. Statutory Framework

The parties differ on the relevancy and interpretation of statutes, Army regulations, and the West Point and USUHS Service Agreements. Plaintiffs argue that the ABCMR's interpretation of plaintiffs' remaining service obligation is inconsistent with: (1) the plain meaning of the West Point Service Agreement and its authorizing statute, 10 U.S.C. § 4348; (2) Army regulation 350–100 and Department of Defense Directive 6000.2; and, (3) the plain meaning of the USUHS Service Agreement and its authorizing statutes. Defendant disagrees and argues that the ABCMR correctly interpreted the applicable statutes and regulations and correctly determined that the language of the Service Agreements was consistent with their interpretation of those statutes and regulations.

## 1. The ABCMR Determination Does Not Conflict With the Statutes Authorizing the West Point Service Agreement, 10 U.S.C. § 4348, and Describing the USUHS Attendance Requirements, 10 U.S.C. § 2114, nor is it Arbitrary and Capricious.

■ Plaintiffs argued, and the Magistrate Judge agreed, that the ABCMR's determination that their West Point ADSOs were not served while the plaintiffs were attending USUHS, conflicted with the language of § 4348 and § 2114. Plaintiffs claim that because they were on "active duty" while they attended USUHS,

pursuant to § 4348, their ADSOs began running immediately upon graduation from West Point. Defendants contend that the ABCMR's decision is not in conflict with § 4348, as plaintiffs (1) were not on active duty in the *Regular Army;* and, therefore, (2) their West Point service did not begin immediately upon graduation.

First, plaintiffs' West Point ADSO is described in 10 U.S.C. § 4348(a)(2), and mirrored in their West Point Service Agreements. Section 4348(a) provides two ways in which the ADSO can be fulfilled. First, Subsection (a)(2) allows fulfillment of the West Point ADSO by five years active duty in the Regular Army:

> That upon graduation from the Academy the cadet—
>
> (A) will accept an appointment, if tendered, as a commissioned officer of the *Regular Army* or the Regular Air Force; and
>
> (B) will serve *on active duty* for at least five years immediately after such appointment.

10 U.S.C. § 4348(a)(2) (1964) (emphasis added). Subsection (a)(3) allows for fulfillment of the West Point ADSO by six years of service as an officer in the Reserves:

> That if an appointment described in paragraph (2) is not tendered or if the cadet is permitted to resign ... the cadet—
>
> (A) will accept an appointment as a commissioned officer ... for service in the Army Reserve ... and
>
> (B) will remain in that reserve component until completion of the commissioned service obligation of the cadet.

10 U.S.C. § 4348(a)(3) (1964).

In order to attend USUHS, plaintiffs were required to resign from the Regular Army and accept positions as officers in the Reserves. USUHS Agreement at ¶ 3 (1983) ("I will accept a Reserve appointment as a Medical Service Corps Officer, commissioned grade O–1."). Plaintiffs ar-

gue that despite this appointment to the Reserves, they still fulfilled the requirements of Subsection (a)(2) because they were on active duty in the Medical Corps during their USUHS training, acting in the capacity of active duty officers, as was required by statute under 10 U.S.C. § 2114. Defendants argue that in order to toll the active duty requirement under § 4348(a)(2), the plaintiffs must have been in the "Regular Army," while, in fact the plaintiffs were serving in the Reserves.

It is apparent from the plain language of § 4348(a)(2) that plaintiffs were required to be in the Regular Army to satisfy the "active duty" obligation under that subsection. Not only is the service in the "Regular Army" specified in subsection (a)(2), but to allow "active duty" under (a)(2) to include service in the Reserves would make Subsection (a)(3) redundant.

Further, though 10 U.S.C. § 2114(b), does provide that "[m]edical students ... shall serve on active duty," it does not specify whether that active duty should be served in the Regular Army or the Reserves. In fact, § 2114 goes on to note that "[u]pon graduation [from medical school] they shall be appointed in a regular component." 10 U.S.C. § 2114(b) (1980). Had Congress intended all "active duty" service to be in the Regular Army, the latter language would not have been necessary.

Also, plaintiffs' claim that service in the Medical Corps while at USUHS amounted to constructive Regular Army "active duty," is unsupported by the record. They argue that, pursuant to their "active duty" status at USUHS they received salaries consistent with active duty pay grade O 1, and were subject to military discipline within the military chain of command. However, defendants point out that duty served at grade "O 1" is not equal to the pay grade for officers on active duty who are not in training, and there is no evi-

dence in the administrative record that the "active duty" served by the plaintiffs involved anything outside of the obligations any medical student in a civilian institution would owe. In fact, during the motions hearing before the Court, the government argued: "[the plaintiffs] didn't have any active duty Army duties to attend to, other than their medical school program requirements." (Tr. at 76), and the only duty they do have "is to receive education." (Tr. at 55). The plaintiffs even admitted that any duties they performed at USUHS would be "purely medical duties," (Tr. at 8) and did not identify any evidence on the record to the contrary. Thus, though the plaintiffs were on "active duty" while at USUHS, they were in the Reserves rather than the Regular Army, so the plaintiffs could not have been fulfilling their West Point ADSO pursuant to Subsection (a)(2).

Second, plaintiffs argue that even if they were serving in the Reserves, rather than in the Regular Army, their West Point obligation still tolled as a "commissioned service obligation" under §§ 4348(a)(3) and (d). Section(a)(3), quoted above, allows for fulfillment of the West Point ADSO via service as a "commissioned officer" in the Army Reserve. 10 U.S.C. § 4348(a)(3) (1964). The "commissioned service obligation" described in subsection (a)(3) is later defined as "the period beginning on the date of the officer's appointment as a commissioned officer and ending on the sixth anniversary of such appointment ..." 10 U.S.C. § 4348(d)(1964).

However, in contrast to the explicit "immediately" and "upon graduation" language in subsection (a)(2), subsection (a)(3) merely requires that the cadet "will" accept a Reserve appointment and remain in the component until the obligation is fulfilled. Plaintiffs argue that because their service in the Reserves began upon signing of their USUHS agreements, which required resignation and appointment to

the Reserve, their West Point obligation should have been fulfilled continuously from that point in time forward. The statute, however, does not require that the "commissioned service obligation," an alternative to active duty, begin immediately. The ABCMR's interpretation of the required service in the Medical Corps during medical school as exclusive with respect to the West Point ADSO is not contradicted by the language of Subsection (a)(3). The plaintiffs need not have served, according to the statute, their West Point ADSO while in medical school. The Army was free, under Subsection (a)(3) to promulgate regulations to that effect.

Finally, plaintiffs claim that § 2114 carefully singled out particular circumstances in which ADSOs owed for USUHS education could not be served, providing that "[a] period of time spent in military intern or residency training shall not be creditable in satisfying a commissioned service obligation imposed by this section." 10 U.S.C. § 2114(c) (1979). Service of West Point ADSOs during USUHS training, they argue, could have been proscribed just as easily. This argument by negative inference, however, is insufficient to overcome the Army's reasonable interpretation of the statutes that do exist.

Therefore, the ABCMR interpretation, that plaintiffs' "active duty" service while at USUHS did not fulfill their West Point ADSOs, did not contradict the plain meaning of either § 4348 or § 2114.

**2. The ABCMR's Interpretation of Army Regulation 350–100 and DOD Directive 6000.2 Deserves Deference Because It Does not Clearly Contradict the Regulation and is Further Supported by Army Regulation 351–3.**

██ Plaintiffs argue that the ABCMR incorrectly applied Army Regulation 350–

100, and improperly failed to exclude them from the provisions of DOD Directive 6000.2. Defendants contend that the ABCMR decision is not contrary to Army Regulation 350–100, nor did plaintiffs qualify for an exemption from 6000.2, as neither was a qualifying "health services officer" at the time they signed their USUHS agreement.

### a. Army Regulation 350–100

Defendants argue that nothing in Army Regulation 350–100 precluded the ABCMR's determination that plaintiffs' West Point service obligation ran consecutively to their training at USUHS. However, plaintiffs contend that A.R. 350–100 requires that West Point service obligations run concurrently with all other service obligations, save those incurred through army-sponsored civilian training.

A.R. 350–100 provides that a West Point "ADSO is effective from the date of entry on active duty, [and] is served concurrently with all ADSOs except for civilian schooling." A.R. 350–100, Table 3–1, n. 1–2 (1988).[4] "Consecutive obligations" are also mentioned under this section and include only "ADSOs resulting from more than one civilian education program." A.R. 350–100, 3–3.

Though plaintiffs correctly identified the table determining service of West Point ADSOs, they failed to recognize the limited scope of the consecutive service proscription. A.R. 350–100, entitled "Officer Active Duty Service Obligations," does not control interpretation of the relationship between their West Point and USUHS obligations, as the regulation "does not apply to officers serving on active duty for training . . ." A.R. 350–100 at i.

Plaintiffs were indeed serving on active duty "for training," while attending USUHS. They were statutorily required to be on "active duty" while attending USUHS, 10 U.S.C. § 2114(b)(1980), not as regular officers, but in the Reserves. Plaintiffs' sole responsibility during this time was medical training at USUHS. Finally, duty served at grade "0–1" is not equal to the pay grade for officers on active duty who are not in training.

### b. Department of Defense Directive 6000.2

Defendants contend that the ABCMR correctly relied on DOD Directive No. 6000.2, as (1) plaintiffs were engaged in a period of "long-term health or health-related education"; and (2) the Directive proscribes service of prior service obligations during that period. Plaintiffs argue that the Directive explicitly excluded them from its terms.

In pertinent part, the Directive provides:

F. *Exclusions*

Nothing in this Directive shall be used to change an ADO or an active duty agreement entered into in writing *by a health services officer before the date of the implementation of this Directive.*

*(3) Payback of a Prior Obligation. No portion of a prior obligation arising out of the expenditure of government funds for education or training purposes may be satisfied during any period of long-term health or health-related education training.*

*(4) Payback of an ADO Incurred Under the Provisions of this Directive.*

---

**4.** The version of A.R. 350–100 provided to the court was effective in 1988, however the plaintiffs confirmed at oral argument that the regulations have not changed since the plaintiffs signed the USUHS agreements, beginning in 1983. (Tr. at 90).

No portion of an ADO may be satisfied: ...

(c) Concurrently with any other ADO or with an obligation incurred for DOD-subsidized pre-professional (undergraduate) education or training, or prior long-term health or health-related education or training.

D.O.D. Directive No. 6000.2 (March 19, 1981) (emphasis added).

Defendants argue that plaintiffs, while attending USUHS were engaged in a "period of long-term health or health-related education," Directive at 3 § F2, 4 ¶ 4. Because they were so engaged, "no portion of a prior obligation arising out of the expenditure of government funds for education ... may be satisfied." Plaintiffs had such a prior obligation, in the form of their West Point ADSOs, which therefore could not have been satisfied while attending USUHS.

However, plaintiffs contend that nothing in the Directive, including the exclusion detailed above, can be used to change an ADSO incurred pursuant to an agreement entered into "before the date of implementation of this Directive," by a "health services officer." DOD at 3 ¶ F. Plaintiffs signed their West Point agreement in 1979, three years before the Directive was promulgated, which clearly qualifies it as an agreement entered into before the implementation date of this Directive. However, Health Services officers only include "those officers serving in the Medical Corps ... [or] in DoD programs leading to commissioning in any of these corps."

DOD Directive 6000.2 at 4 ¶ 1. Plaintiffs did not join the Medical Corps until signing their USUHS agreement in 1983. *See* USUHS Service Agreement at 2 (1983) (medical students "accept a Reserve appointment as a Medical Service Corps officer"). Nor is it unreasonable that the ABCMR did not consider plaintiff's West Point training, in engineering and artillery, as the equal of "a program leading to commissioning in any of these corps." DOD Directive 6000.2 at 4 ¶ 1.[5] As plaintiffs were not health services officers when entering into their West Point ADSO, they do not qualify for an exclusion from the provisions of the Directive. Without such an exclusion, the Directive requires that no prior obligations, like plaintiffs' West Point ADSOs, may be satisfied during a period of long-term health related education, which includes plaintiffs' USUHS training. Therefore, the ABCMR reasonably concluded plaintiffs' West Point ADSOs could not have been satisfied while plaintiffs attended medical school.

**c. Army Regulation 351–3**

Significantly, another applicable regulation, A.R. 351–3,[6] entitled "Professional Education and Training Programs of the Army Medical Department," governs "active duty obligations (ADSO) incurred for taking part in long-term health and health-related education and training programs." In an almost perfect echo of DOD Directive 6000.2, A.R. 351–3 provides that "no portion of a prior obligation arising out of the expenditure of Government funds for education or training purposes may be

---

**5.** The list of Corps programs whose members qualify include exclusively healthrelated fields (Medical Corps, Dental Corps, Veterinary Corps, Nurse Corps, Medical Service Corps, Army Medical Specialist Corps, and Biomedical Science Corps). DOD Directive 6000.2 at 4 ¶ 1 (March 19, 1981).

**6.** Neither of the parties nor the ABCMR addressed the substance of A.R. 351–3, however, the relevant portions of 351–3 are virtually identical to the language in DOD directive 6000.2, relied upon by both the defendants and the ABCMR.

satisfied during any period of long-term or health-related education or training." A.R. 351–3, § 10–1 (1988) [7] Nor can "an ADO ... be satisfied ... [c]oncurrently with any other ADO or with any obligation incurred for DOD subsidized preprofessional (undergraduate) education or training ..." A.R. 351–3, § 10–2. Regulation 351–3 clearly supports the ABCMR's decision that the plaintiffs' ADSOs could not have been fulfilled during their USUHS training.

### 3. The Language of the West Point and USUHS Service Agreements Is Consistent With the ABCMR's Interpretation of the Applicable Statutes and Regulations.

■ Finally, the plaintiffs argue that the plain language of the USUHS agreement does not support the ABCMR determination that the West Point ADSOs could have been served in concert with the plaintiffs' USUHS attendance. The defendants claim that the language of the USUHS contract precludes such concurrent service.

First, had plaintiffs and the Army entered into service agreements that contradicted the applicable statutes and regulations, then this Court would be faced with a more difficult question. However, contrary to plaintiffs' assertions, the agreements signed by plaintiffs and the Army can be read consistently with the statutory and regulatory framework discussed above.

The USUHS agreement provides that the West Point ADSO:

(4) "... *will be served consecutively* with the *service obligation* incurred by my participation in the medical program

of the United States University of the Health Sciences. This obligation will be served in addition to internship & residency training in accordance with the policy of the military service in which I am appointed. I acknowledge that my remaining service obligation incurred prior to entry into the medical program is *25 May 1988*, and that *this service obligation will extend the service obligation incurred* as a result of my participation in the medical program."

USUHS Service Agreement (1983) (emphasis added). Two phrases speak explicitly to the relationship between the West Point ADSO, and the ADSO incurred for USUHS attendance. First, the agreement provides that the first obligation must be served "consecutively with the service obligation incurred by my participation in the medical program," and, second, the agreement provides that the prior "service obligation will extend the service obligation incurred" as a result of USUHS training. Plaintiffs argued that this language means only that the USUHS ADSO must be served after the West Point ADSO has been completed, but not necessarily after plaintiffs completed their medical training at USUHS.

Plaintiffs and the Magistrate Judge are correct that the language of the Service Agreement is less than clear. However, a close examination of that language reveals that the plaintiffs' argument fails.

First, plaintiffs began serving the service obligation incurred as a result of attending USUHS upon graduation from medical school. It is not rational to speak of serving two ADSOs consecutively prior to one of them becoming due. In addition,

---

7. The current version of Army Regulation 351–3 §§ 10–1 and 10–3 (1988), though originally numbered §§ 7–1 and 7–3, have remained substantially unchanged since the chapter was added to A.R. 351–3 in 1977. (Interim Change Number 1–1 to AR 351–3, January 25, 1974, effective October 1, 1977).

the agreement states that the *prior* ADSO will "extend" the latter ADSO. Plaintiffs' interpretation of the agreement, that the West Point ADSO could be served while attending USUHS does not account for the use of the word "extend." If the West Point ADSO was fulfilled during medical school, the seven-year obligation incurred by attending USUHS would not be extended at all by the West Point obligation. The word extend indicates that plaintiffs' obligation was greater than seven years after graduation from USUHS.

Second, plaintiffs' argument assumes that the "service obligation" referred to in both clauses of the USUHS agreement only refers to the seven-year "service obligation" medical students must serve after graduating from USUHS. However, the same contract also provides that students "will accept a Reserve appointment as a Medical Service Corps officer," creating a *Reserve* "service obligation," to be fulfilled *while* attending medical school. USUHS Agreement at 2. If the agreement was referring to this Reserve service obligation, then the agreement would prevent plaintiffs from serving their Reserve "service obligation ... concurrently" with their West Point ADSO.

Both these interpretations of the USUHS Service Agreement not only reflect a reasonable interpretation of the language, but also are consistent with Army policy. After all, as the government has pointed out, it makes the privilege of both undergraduate and medical education available at no cost to students, in anticipation of a significant return on its investment. The Army, then, gets "a bigger bang for th[eir] buck," (Tr. at 78) when those students become Army doctors. The government also expressed concern that "it's very difficult for the Army to get

qualified doctors ..." (Tr. at 81). This policy concern is entirely consistent with the power granted to the Secretary of the Army, to condition "advanced education assistance"[8] under 10 U.S.C. § 2005(a), on "such other terms and conditions as the Secretary concerned may prescribe to protect the interests of the United States." The legislative history of 10 U.S.C. § 2114 indicates that Congress apparently shared the government's concern. *See* H.R. Conf. Rep. No. 92–1320 at *3 (1972)(creation of the USHUS would "greatly assist us in retaining highly qualified members of the health professions into the military departments."); S.Rep. No. 92–827 at *4 (1972), *reprinted in* 1972 U.S.C.A.N.N. 3329 (citing the "severe retention problem" of keeping physicians in the armed forces as one of the central motivations for creation of the USUHS). To allow servicemen like plaintiffs to subtract at least four years of time in service obligations would divest the government of a significant portion—at least twenty-five percent—of that "bang" it expects back from the thousands of dollars of free education provided to plaintiffs.

In *Dickson*, this Court addressed the policy justifications for the consecutive ADSO requirement. 725 F.Supp. at 46–47. Prior to 1974, officers who attended both West Point and graduate medical school got the benefit of what was called the "merger rule." *Schaefer*, 725 F.Supp. at 47. While graduates of West Point incurred a five-year ADSO and graduates with subsidized medical training incurred a seven-year ADSO, the obligations of those who did both merged into a seven-year ADSO. *Id.* In 1974, the Army did away with the merger rule, and the ADSOs became consecutive. *Id.* This Court explained that this change was the result of the Army's determination that "they were

---

8. The enabling statute defines "advanced education" to include any "education or training above the secondary school level." 10 U.S.C. § 2005(e)(1) (1983).

not receiving a good return on their investment by providing individuals with four years of school at USMA, four years of medical school, a year of internship training, and residency training in exchange for only seven years of total service commitment." *Schaefer,* 725 F.Supp. at 47 n. 5. If this Court were to allow plaintiffs to fulfill their West Point ADSO while attending USUHS, the policy behind rejecting the merger rule would be undermined. Plaintiffs in effect advocate a return to the pre 1974 system, where they would receive West Point and medical training and incur only the medical school obligation.

However, plaintiffs also make much of the fact that the version of the USUHS Service Agreement promulgated a year after plaintiffs signed their service agreements seemed to recognize the ambiguity in the old agreement and, in an effort to cure it, required:

> 12. I understand that the following provisions apply to the discharge of my active duty obligation...
>
> d. Time spent on active duty or active duty for training while a member of the Program prior to completion of professional degree requirements will not be credited toward fulfillment of any active duty obligation.

USUHS Service Agreement (1984). First, the fact that the Army clarified the language of the new agreement does not imply that it changed the actual requirements under the agreement. Second, the revision was part of approximately four pages added to the agreement. Other "new" provisions included a certification that the signer meet citizenship and age requirements, *see* USUHS Service Agreement (1984) at ¶ 1, as well as an agreement to "complete the educational requirements," *id.* at ¶ 15(a), and "meet the physical fitness, weight control and uniform wear and appearance standards ..." *Id.*

Surely plaintiffs could not argue that any of these requirements, though not explicitly included in the 1983 version of the agreement, were not required before the change.

## III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that plaintiffs' motion for preliminary injunction or summary judgement is **DENIED**. It is

**FURTHER ORDERED** that plaintiff Fontana's motion for temporary restraining order is **DENIED**. It is

**FURTHER ORDERED** that defendants' motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**